Judge Marsha J. Pechman

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | NO. CR-09-0084-MJP |
| | ) | |
| Plaintiff, | ) | GOVERNMENT'S |
| | ) | SENTENCING MEMORANDUM |
| v. | ) | RE: VLADISLAV BAYDOVSKIY |
| | ) | |
| VLADISLAV BAYDOVSKIY, | ) | |
| | ) | [Hearing Date: December 18, 2009] |
| Defendant. | ) | |
| | ) | |

## I.   INTRODUCTION

Defendant Vladislav Baydovskiy comes before the Court having pled guilty to conspiring to commit bank fraud, mail fraud, and wire fraud in violation of Title 18, United States Code, Section 371.  Defendant Baydovskiy's five co-conspirators, Viktor Kobzar, Camie Byron, Alla Sobol, David Sobol and Sandra Thorpe all entered guilty pleas to the same charge.  Mr. Baydovskiy also pled guilty to filing a false personal income tax return. The seventh defendant, his wife, Donata Baydovskiy, entered a guilty plea to making a false statement in a matter occurring before the Department of Housing and Urban Development. The false statement was made during the course of the charged conspiracy.

The charged conspiracy arose from a scheme to defraud lending institutions into making mortgage secured purchase money and refinance loans.  An additional aspect of the scheme included defrauding otherwise unqualified prospective borrowers to secure purchase money loans based on false and fraudulent representations.  The defendants profited from the

Government's Sentencing Memorandum
Baydovskiy, Vladislav
Baydovskiy et al., CR-09-0084-MJP - 1

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

scheme by charging excessive fees and diverting some of the fraudulently obtained loan proceeds to themselves.  The scheme succeeded in large part due to the defendants' ownership and operation of both a mortgage loan brokerage business (Kobay and Nationwide) and an escrow operation (Emerald City Escrow).  Defendant Vladislav Baydovskiy's role in the charged scheme spanned the entire term of the operation and included operating both Kobay and Nationwide.

## II.   FACTUAL BACKGROUND

The facts and circumstances underlying the offense conduct for which Mr. Baydovskiy pled guilty are summarized in the Plea Agreement and Presentence Report. (See Plea Agreement, pp. 6-12; P.S.R. ¶¶ 14-35).

There are several additional facts the government believes should be considered by the court in imposing a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in 18 U.S.C. § 3553(a).  While not included in the agreed statement, the events and actions noted below relate to Mr. Baydovskiy's activities as a professional engaged in the mortgage lending business.

### A.   Mr. Baydovskiy's Extensive Experience In The Mortgage Lending Business

Mr. Baydovskiy pled guilty to participating in a mortgage fraud scheme that began "no later than September 15, 2005."  In fact, Mr. Baydovskiy had been fully employed in the mortgage lending industry as a loan officer and mortgage broker for approximately seven years before becoming an active participant in the charged, and agreed, scheme.  This prior experience provided the foundation from which the scheme was developed.

Mr. Baydovskiy worked as a loan officer for two mortgage brokers before joining with co-defendant Viktor Kobzar to open Kobay Financial Corporation in 2000.  According to information provided by Mr. Kobzar, Kobay engaged in fraudulent activity from nearly the beginning of its business operations.  False information related to prospective borrowers'

Government's Sentencing Memorandum
Baydovskiy, Vladislav
Baydovskiy et al., CR-09-0084-MJP - 2

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

qualifications was provided to lenders in efforts to obtain mortgage backed residential real estate loans.  When asked by the government to explain the fraud, Mr. Kobzar stated:[1]

> MR. OESTERLE:  So then my sense is that this-- these fraudulent practices started when you started at Kobay, these are things you picked up on your own?
>
> MR. KOBZAR:  Acubank, Kobay, uh, very little bit in Acubank because we-- I've done like I said two deals in Acubank.  Vlad done a lot more in Acubank.  But, uh, correct, in Kobay that's kind of where it all–
>
> MR. OESTERLE:  Started?
>
> MR. KOBZAR:  --started little by little.
>
> MR. OESTERLE:  And is it something that you were necessary instructed on by Vlad or did you come up with some of this independently?
>
> MR. KOBZAR:  It was kind of, uh, observed what's going on.  Uh, Vlad–
>
> MR. OESTERLE:  Observed-- observed by you?
>
> MR. KOBZAR:  By me, (Inaudible) myself.
>
> MR. OESTERLE:  Okay.
>
> MR. KOBZAR:  I observed of what's going on and kind of, uh, um, wanted to be "competitive" and successful and kind of all right how this is done, how is this done and that's kind of where it got picked up from observing, uh, other people hinting, uh, doing and seeing it how it's done.
>
> MR. OESTERLE:  Within Kobay?
>
> MR. KOBZAR:  Within Kobay.
>
> MR. OESTERLE:  So they were your employees?
>
> MR. KOBZAR:  Um, a li-- employees weren't doing a lot of business.  If they were doing a lot of business they weren't doing a good business, I'm–
>
> MR. OESTERLE:  I mean, who were–
>
> MR. KOBZAR:  --talking about clean files.
>
> MR. OESTERLE:  Who were you observing that was doing this?
>
> MR. KOBZAR:  We're talking about Vlad here.
>
> MR. OESTERLE:  Okay.  Only Vlad?

---

[1]Excerpts from transcripts of recorded interviews conducted on August 3, 2009 and August 12, 2009 between Viktor Kobzar and government investigators and prosecutors. Copies of the transcripts were included in discovery materials produced to the defendants.

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1    MR. KOBZAR:  Correct.

2        Mr. Kobzar further offered a history of Kobay's business operations in California and

3  Oregon.  Those operations shed additional light on Mr. Baydovskiy's conduct in the charged

4  scheme presently being prosecuted in this case.  According to Mr. Kobzar, he and Mr.

5  Baydovskiy decided to open an office in southern California under the Kobay name.  A

6  similar operation was begun in Arizona and a brokerage license was sought and obtained in

7  the State of Oregon, although no separate business location was opened in Oregon.

8        State regulators in both California and Oregon took administrative enforcement actions

9  against Kobay and Messrs. Kobzar and Baydovskiy personally for alleged fraudulent activity

10  associated with their mortgage brokerage operations.  Copies of the relevant pleadings are

11  attached to the Declaration of Silvia Reyes filed contemporaneously with this memorandum.

12  Mr. Kobzar offered the following regarding Kobay's business practices in California:

13    MR. STEPHENSON:  How long was that [California] office  going?

14    MR. KOBZAR:  Four years.

15    MR. STEPHENSON:  Was there fraud on those deals too?

16    MR. KOBZAR:  A lot.

17    MR. STEPHENSON:  A lot of fraud?

18    MR. KOBZAR:  A lot, tons, maybe, uh, every file. ...

19    **B.    Mr. Baydovskiy Participates In Forming And Operating Nationwide**

20        Concern for lender reaction to the licensing and disciplinary issues in Oregon and

21  California subsequently led Messrs. Baydovskiy and Kobzar to explore alternatives to

22  continuing their mortgage brokerage business under the Kobay name.  Faced with the prospect

23  of losing lender options for placing loans, Messers. Baydovskiy and Kobzar teamed with co-

24  defendant Alla Sobol, a former classmate and business contact of Mr. Baydovskiy's, to form a

25  new company.  As described by Mr. Kobzar, Nationwide Home Lending was formed to re-

26  establish business relationships damaged by a growing perception amongst lenders that Kobay

27  engaged in fraudulent practices:

28

Government's Sentencing Memorandum
Baydovskiy, Vladislav
Baydovskiy et al., CR-09-0084-MJP - 4

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

MR. STEPHENSON:  Okay.  I-- I want to come back to this subject, um, but I-- I kind of want to get back to where we are chronologically and get back to the opening of Nationwide and how Kobay closed here in Seattle if we can.
But I definitely, we're going to revisit this topic.

MR. KOBZAR:  Okay.  Um, since, uh, Kobay Financial the name and then Viktor Kobzar, Vladislav Baydovskiy who was in the-- on their radar, um, maybe some entities big time, some entities might be just beyond.

MR. STEPHENSON:  Why would it have been on the radar because of the fraud?

MR. KOBZAR:  Yes.  Um, we knew that, uh, sooner or later, uh, Olympia would pull our license or, um, something else would happen.  And we, Vlad and I decided to, uh, or mostly-- most of the time he is kind of thinking about, uh, leaving our names alone, let it calm down, settle down, uh, let's move on from it, it has too much dirt let's just say.  And, uh, he knew Alla Sobol, uh, he knew from University of Washington where they got-- they were, uh, going to the same school, they kind of met over there.  She also worked for Central Bank where she was account executive maybe a little bit even higher then account executive, uh, for that, uh, bank.
And she was, um, uh, le-- we got approved with her and the reason is because hey, uh, she also found out Vlad is in the same industry so, uh, there was no issue getting a, uh, themselves approved or ourselves approved with that bank.
Uh, she would, uh, come in and, uh, spend time, uh, in the office, uh, they would have, uh, relationship, uh, friend-- friendly relationship, uh, between each other.  And, uh, they got, uh, him and Alla got to know each other pretty good, uh, in the office, outside the office, maybe some eve-- events.
And, uh-- uh, we are very, uh, casual with her, friendly.  There were, uh, files that, uh-- uh, we have to send to that company where she is working and she would take care of it.  In other words, from rushing-- from rushing, uh, aspect to eve-- to a fraud aspect.  You know, if something needs to be pushed she would be inside person to cover things, uh, push things, uh, into funding, uh, stand over other peoples head make sure the-- the deal is funded.

MR. STEPHENSON:  So you would send her deals knowing that she was going to, uh, cover–

MR. KOBZAR:  Correct.

MR. STEPHENSON:  --the fraud that you guys have done?

MR. KOBZAR:  Correct.

MR. STEPHENSON:  Or commit fraud on her own?

MR. KOBZAR:  Um, yes.

MR. STEPHENSON:  Okay.

MR. KOBZAR:  Uh, because of the good relationship, personal relationship.

MR. STEPHENSON:  Right.

MR. KOBZAR:  And we-- we were able to talk about it open, you know.  So, uh--

MR. KOBZAR: So we knew, uh, we, uh, Alla, uh, was a familiar with Vlad, uh, then it got to know-- she got to know me like a business partner of Vlad. I'm sure he made me look good.

Um, then, uh, I've heard, uh-- uh, Alla Sobol is getting married I was like wow, okay. Um, the wedding was in New York. I was, uh-- uh, Vlad and I was invited. I wasn't invited formally like invitation or anything but just like she wants you to come too, okay.

Um, he went to the wedding, the wedding was in New York like I said, had party and everything, came back. And, uh, I believe she quit, uh, Central Bank at that time, I'm not sure exactly a time frame when she quit. Um, she had nothing else to do, she was bored I think. But, uh, the point is-- the point is, uh-- uh, Vlad is the person who would look for advantages and, uh-- uh, especially with people who he knows.

And, uh, he saw an opportunity that, uh, hey it looks like we are struggling here; we want to get a-- get over with Kobay Financial. Uh, our names let's just, uh-- uh, have Alla set up a totally brand new company license, name and, uh, get approved with banks all over again, uh, totally new company, new structure.

So, uh, I remember, uh, being in the office, uh, they were brainstorming what name to, uh, choose, came to conclusion Nationwide Home Lending. And--

...

MR. BLACKSTONE: Who was doing the brainstorming, you said you were in a meeting where people were brainstorming, who was there?

MR. KOBZAR: Uh, the three of us, Vlad, I and Alla.

MR. BLACKSTONE: You, Vlad and Alla? Okay.

MR. STEPHENSON: Okay. Uh, keep-- keep talking about kind of how it went from Kobay closing down and then?

MR. KOBZAR: So we decided on the name, uh, we went to-- uh, she did the licensing test, exams, tests, filling out all the paperwork. She did all that. Um, uh, I didn't help her out, she-- she knew paperwork pretty good. And, um, maybe I help maybe if she had some question hey what insurance company you used or, uh, I would tell her then she would use something else totally just to see if, uh, I knew certain-- she was probably brainstorming and, uh, I would, uh, let her know what I know.

And, uh, so the license was, uh, figured out. Uh, she passed exam. We went to Bank of America in a, uh, Lake Hills and, uh, open up an account, all of us, the three of us, uh, on Nationwide Home Lending LLC. Uh, we each deposited, uh, I believe $10,000 each. That's, uh, for money to be used for, uh, you know, getting st-- uh, come-- getting company started, office supplies, maybe computers, maybe lease. Uh, just, uh, some kind of commitment.

And if there is a financial need in the future then, uh, that's the money we would be using. We set that up. There was a conversation I remember a couple of good conversations. Uh, Alla had, uh, had been stressing out, uh, who should be running, um, Kobay Financial, uh, accounting books, uh, money, managing, uh, checking, saving-- checking account, paying bills.

And, uh, there was an offer to hire an accountant, a totally different accountant so it's not in my hands Vlad's or Alla's, just have an accountant working in the office, maybe coming to the office, uh, um, you know, eight hours a week, uh, just to go through things, uh, maybe more, maybe less.

But that was the original idea and we were talking about it. First couple of days Vlad was-- was like let her fume out, let Alla calm down, you know, talk talk talk and then she talked everything out and then he would let it cool and then he would pursue with his own plan.

And that plan was him managing finances.

MR. STEPHENSON:  So he was the manager of all the finances?

MR. KOBZAR:  Yeah.  He was managing, uh, Kobay everything.  Kobay in California.

MR. STEPHENSON:  He managed Kobay–

MR. KOBZAR:  Kobay in Washington, uh, Kobay in Arizona and Nationwide Home Lending.

MR. STEPHENSON:  Okay.

MR. KOBZAR:  Uh, it was on his computer one program QuickBooks, uh, password protected and that.  Um, so that issue he kind of convinced her that he knows tricks of the trade I'll just say that.  In other words, he knows how to file in QuickBooks, how to get around certain, uh-- uh, bills, uh, certain pays.
Uh, he-- he is a-- he knew how to do it.  We'll just call-- we'll just say he was calling himself sometimes Master of Disaster.  And that's his words.  Um, but, uh, he, uh, from a day one he knew that he would be running it.  It was just a matter of time of convincing her and, uh, doing it.  So he did his-- did his best, uh, (Inaudible) he convinced her she agreed and he was running it.

C.     **Mr. Baydovskiy Continued Engaging In Fraudulent Conduct After The Charged Scheme Ended**

Emerald City Escrow ceased operations in late December 2008.  Alla Sobol unilaterally forfeited her mortgage brokers license in October 2008, effectively terminating Mr. Baydovskiy's ability to solicit loans using Nationwide.  The closure of Emerald City and Nationwide did not, however, deter Mr. Baydovskiy from using many of the same fraudulent practices in continuing efforts to obtain real estate loan proceeds.  These efforts are summarized at paragraphs 7 through 15 in the Declaration of Silvia Reyes, filed contemporaneously with this memorandum.

As explained by Special Agent Reyes, Mr. Baydovskiy used the identity and credit of a third party to apply for home equity lines of credit from several credit unions over a span of several weeks in early 2009.  He falsified the purported borrower's qualifications and creditworthiness by inflating income and assets.  After a least two failed attempts, he succeeded in obtaining an approximately $200,000 loan.  The lender has declared the loan a total loss.

Government's Sentencing Memorandum
Baydovskiy, Vladislav
Baydovskiy et al., CR-09-0084-MJP - 7

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

### III.   ADVISORY GUIDELINE CALCULATION

The parties' plea agreement does not include an agreed advisory guideline calculation for either count of conviction.  The government agrees with the offense level computations reached by the Probation Office and set forth at ¶¶ 43-64 of the Presentence Report.  In accordance with those agreed computations, Mr. Baydovskiy's total adjusted offense level should be 27.  The resulting advisory guideline range would be 70 to 87 months applying a criminal history category of I.

### A.   A Reasonable Estimate Of The Loss For Guidelines Purposes Is More Than $2.5 Million But Not More Than $7.0 Million

The parties have entered into a stipulation agreeing that the government can establish an estimated loss amount attributable to the admitted fraud for purposes of calculating the applicable offense level of between $2.5 million and $7.0 million.  The stipulation was sought in the interest of avoiding a potentially protracted evidentiary hearing for the limited purpose of establishing a reasonable estimate of the loss.[2]  Recognizing that the court must make its own loss determination, the government offers the following legal points.

Absent the stipulation, the government anticipates that the Defendant would contest the loss amount as preliminarily calculated by the Probation Office and the government.  While the government readily concedes that establishing a precise loss amount may be problematic, such precision is not required.  *See, e.g. United States v. Showalter*, 596 F.3d 1150, 1161 (9th Cir. 2009)("a district court has a number of permissible methods for determining monetary loss, and 'need not make its loss calculation with absolute precision.'") citing *United States v. Zolp*, 479 F.3d 715, 719; *United States v. Garro*, 517 F.3d 1163, 1167 (9th Cir. 2008)("loss need not be determined with precision, but need only be a reasonable estimate...given the available information); *United States v. Miller*, 188 F.3d 1312, 1317 (per curiam) (11th Cir. 1999) (explaining that courts may reasonably estimate the amount of loss because  "often the

---

[2] The stipulation specifically provides that it shall not apply to the judicial determination of restitution in this case. The parties are free to advocate for any amount of restitution, wholly independent of the stipulated loss range.  In addition, evidentiary submittals offered to substantiate the agreed loss estimate for guidelines purposes are not to be cited to the court for purposes of challenging any proffered claim for restitution.

Government's Sentencing Memorandum
Baydovskiy, Vladislav
Baydovskiy et al., CR-09-0084-MJP - 8

amount of loss caused by fraud is difficult to determine accurately.").  As discussed below, the government's proffered loss amount attributable to the charged and admitted scheme is a reasonable estimate supported by reliable and sufficient evidence.

### 1.   The Government's Proposed Methodology Is Consistent With The Guidelines And Ninth Circuit Authority

U.S.S.G. § 2B1.1(b)(1) provides for an increase in the base offense level based on the loss amount.  Application Note 3(A) defines loss as "the greater of actual loss or intended loss that resulted from the offense."  "'Actual loss' means the reasonably foreseeable pecuniary harm that resulted from the offense."  Application Note 3(A)(I).  "'Intended loss' . . . means the pecuniary harm that was intended to result from the offense . . . and . . . includes intended pecuniary harm that would have been impossible or unlikely to occur . . . ."  Application Note 3(A)(ii).

As to determining the loss, "[t]he court need only make a reasonable estimate of the loss."  Application Note 3(C).  *See also United States v. Lutz*, 154 F.3d 581, 590 (6th Cir. 1998) ("In determining the loss for sentencing purposes, a district court need only make a reasonable estimate of the loss, and this court reviews for clear error and reverses the valuation only if it is outside the realm of permissible computations.") (citation omitted).[3]

In the case of collateral pledged or provided by the defendant, a credit must be applied based on the fair market value or disposition amount of the collateral at the time of sentencing.  Application Note 3(E)(ii).  Notably, this basis for reducing the amount of the loss turns on the defendant's own efforts or own collateral, not the efforts or collateral of a third party.

Courts have approved a common methodology for assessing a reasonable estimation of loss in cases with mortgage fraud schemes employing practices similar to those used in this case.  This methodology properly holds the mortgage fraudster responsible for the loan money

---

[3] It is important to note that the loss calculations necessary to determine restitution under § 3663, and the loss determination necessary for guidelines purposes under USSG § 2B1.1 are distinct. The purpose of restitution is restorative, to compensate the victims of the offense conduct for harm caused by the defendants.

Government's Sentencing Memorandum
Baydovskiy, Vladislav
Baydovskiy et al., CR-09-0084-MJP - 9

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1  received as a result of the fraud, but appropriately deducts from the loss amount the fair

2  market value of the collateral, as suggested by Application Note 3(E)(ii) to U.S.S.G. §2B1.1.

3  This is the methodology recommended by the government and employed by the Presentence

4  Report to determine actual loss.

5        Subtracting the value of collateral at the time of sentencing from the mortgage loan

6  proceeds to determine actual loss to lenders was employed the Eighth Circuit in *United States*

7  *v. Parish*, 565 F.3d 528 (8th Cir. 2009) in determining loss for sentencing purposes.

8  According to the court in *Parish*:

> 9  Pursuant to U.S.S.G. § 2B1.1, the equation used to calculate actual loss to the lenders is the amount of the fraudulently obtained mortgage loans minus any payments made
> 10  on the loan principal and the value of the collateral at the time of sentencing. *See* U.S.S.G. § 2B1.1 app. n. 3 (E)(I) and (E)(ii).  The government submitted evidence to
> 11  the district court that the defendants fraudulently obtained 195 mortgage loans from twenty-four separate lending institutions, resulting in defendants receiving
> 12  approximately $85 million in loan proceeds.  Therefore, we take the amount of the loan proceeds-$85,020,128-and subtract the value of the 195 homes built by PMDC and
> 13  used as collateral.

14  *Id*. at 535.  The government in *Parish* provided the district court with a comparative analysis

15  of the market value of comparable homes to those built by the defendant.  This value was

16  multiplied by the number of properties for which fraudulent loans had been obtained to

17  determine an approximate value of the collateral at the time of sentencing.

18        The First Circuit recently endorsed this approach of "first determin[ing] the total

19  amount of the loan issued for each of the flipped properties, and subtract[ing] from that

20  number the considerably lower amount the land-flippers paid for the piece of property in

21  question . . . [so that the] latter quantity serve[s] as a proxy for the true amount of the security

22  the lender held on the property."  *United States v. Innarelli*, 524 F.3d 286, 290-91 (1st Cir.

23  2008), *cert. denied*, 129 S.Ct 350 (2008).

24        The Ninth Circuit in *United States v. Allen*, 88 F.3d 765 (1996) presented useful

25  guidance for this court to follow in determining a reasonable estimation of loss.  Citing

26  decisions from other circuits, the court in *Allen* held that "actual loss" must take into account

27  the amount recovered or reasonably anticipated to be recovered from collateral that secured

28  the loan, and loan payments made prior to default.  *Id*. at 770 citing *United States v. Rothberg*,

Government's Sentencing Memorandum
Baydovskiy, Vladislav
Baydovskiy et al., CR-09-0084-MJP - 10

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

954 F.2d 217, 219 (4th Cir. 1992) *United States v. Baum*, 974 F.2d 496, 499 (4th Cir. 1992); *United States v. Smith*, 951 F.2d at 1167-68.

The district court in *Allen* found the minimum loss to be $70,255.75. Based on the record below, the court determined that this figure was derived from testimony finding the gross loan value totaled $170,412.68; the proceeds realized from repossession and resale of properties equaled $100,156.93; and the loan payments made prior to default totaled $54,989.15. Finding that the district court properly subtracted the resale proceeds from the gross loan value, the court affirmed the loss determination of $70,255.75.

The defendant in *Allen* argued that the district court should also have subtracted the $54,989.15 of loan payments made prior to default when calculating the actual loss, thereby reducing the actual loss to $15,266.60. Denying this argument, the court noted that the loan payments had been credited by the bank towards interest, not principal. Citing decisions from other circuits approving of the inclusion of accrued interest as part of the actual loss calculation, the court in *Allen* noted that the district court was not asked to include accrued interest as part of the actual loss calculation. 88 F.3d at 771, citing *United States v. Gilberg*, 75 F.3d 15, 19 (1st Cir. 1996)(accrued interest included in the loss calculation under § 2F1.1); *United States v. Henderson*, 19 F.3d 917, 928 (5th Cir.)(same), *cert. denied*, 130 L. Ed. 2d 137, 115 S. Ct. 207 (1994); *United States v. Jones*, 933 F.2d 353, 354-55 (6th Cir. 1991)(same); *United States v. Allender*, 62 F.3d 909, 917 (7th Cir. 1995)(same), *cert. denied*, 133 L. Ed. 2d 732, 116 S. Ct. 781 (1996); *United States v. Lowder*, 5 F.3d 467, 471 (10th Cir. 1993)(same); *contra United States v. Hoyle*, 33 F.3d 415, 419 (4th Cir. 1994)(loss calculation under § 2F1.1 should not include accrued interest), *cert. denied*, 130 L. Ed. 2d 892, 115 S. Ct. 949 (1995). The court found that had the district court included the accrued interest, then interest payments made prior to default would have been taken into account. See U.S.S.G. § 2F1.1 comment. (n.7(b)) ("the loss is the amount of the loan not repaid. . ."); *Rothberg*, 954 F.2d at 219; *Baum*, 974 F.2d at 499; *Smith*, 951 F.2d at 1167-68. The district court in *Allen* used only the loan principal to calculate the "amount of the loan"; it did not consider the accrued interest. Using this approach, payments made towards interest could not be

Government's Sentencing Memorandum
Baydovskiy, Vladislav
Baydovskiy et al., CR-09-0084-MJP - 11

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

considered as repayments made on the loan.  The court affirmed the district court's exclusion of the $ 54,989.15 in interest payments from the loss calculation.

Similarly, the court in *Allen* affirmed the district court's refusal to consider the interest proceeds from the non-defaulting loans.  The defendant argued that the court should have considered the interest income from these loans claiming it was inconsistent to aggregate losses from defaulting loans and ignore gains from non-defaulting loans.  The court affirmed the district court's rejection of  this argument.  Finding the calculations consistent, the court noted that the district court did not include as part of the loss the interest income the bank lost as a result of default, and therefore did not set off against the loss the interest income received from non-defaulting loans.  Contrary to defendant's argument, the court found it was the lost interest income associated with the defaulting loans, not the amount of the unpaid principal, that is the counterpart of the interest income derived from the non-defaulting loans. The interest income lost on the defaulting loans was not included. Therefore, interest income from the non-defaulting loans should not have been included either.

Finally, in a determination applicable to this case, the court in *Allen* ruled that the district court also correctly refused to include payments made on current outstanding loans. For these loans, the risk of default on the then current loans was offset by the current an d prospective amount of income to be collected.  Recognizing the difficulty of accurately estimating the default risk and factoring it into the loss calculation, the court concluded that any prospective income should not be considered.  88 F.3d at 771, citing *Smith*, 951 F.2d at 1169 and *United States v. Hughes*, 775 F. Supp. 348, 351 (E.D. Cal. 1991).  Finding that the district court's determination that future losses and profits were too speculative to consider was not clearly erroneous, the court in *Allen* concluded that it was inappropriate to consider the loan payments made on the outstanding current loans.  *Id.*

In summary, the guideline application notes, as applied by the courts, advocate applying the following methodology to the loss determination in this case:

Government's Sentencing Memorandum
Baydovskiy, Vladislav
Baydovskiy et al., CR-09-0084-MJP - 12

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

- Aggregate the gross loan value of all loans procured by the defendants during the pendency of the charged scheme provided the identified loans were obtained using one or more fraudulent representations;

- Deduct the gross loan value of all loans for which the lender or loan servicing company is not currently reporting a loss or the borrower is not in default;

- Deduct the fair market value of the pledged collateral (measured at or about the time of sentencing) from the aggregate value of all fraudulently obtained loans that were either foreclosed or are presently in default status; and

- Do not include as part of the loss the interest income the lender lost as a result of default and do not set off against the loss the interest income received from non-defaulting loans.

**2.    There Is Sufficient and Reliable Information To Support A Reasonable Loss Estimation Of More Than $2.5 Million But Less Than $7.0 Million**

The government relies on the previously filed Declaration of James C. Vach as evidence supportive of a reasonable loss estimation of more than $2.5 million but likely less than $7.0 attributable to the charged and admitted mortgage fraud scheme.  Dkt. No. 211.  As noted in the Declaration, Mr. Vach is a Consumer Fraud Analyst employed by the United States Postal Inspection Service.  He has actively contributed to the government's investigation and prosecution of this mortgage fraud scheme.  One of the tasks he undertook was to contact all of the lenders identified by the government as extending one of seventy-three (73) loans known to have been obtained using fraudulent representations.  The fraudulently obtained loans were listed in a document entitled "Fraud Book."  The Book, a copy of which is attached to the Declaration as Exhibit A, formed the basis of the charged scheme and was provided in discovery to all the defendants.

Mr. Vach's declaration details his efforts to identify the current lender or loan servicing company for each of the identified loans.  Vach Dec. at ¶ 4.  Each identified lender or servicing company was asked to provide current information regarding the loan status.  For those loans identified as being in default status, the lender or servicing company was asked to

Government's Sentencing Memorandum
Baydovskiy, Vladislav
Baydovskiy et al., CR-09-0084-MJP - 13

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

provide the current fair market value of the property.  Applying the methodology discussed in the preceding section, Mr. Vach assembled the requested information in a second document entitled "Losses from Lenders."  The loss document, a copy of which is attached to the Declaration as Exhibit B, was provided to all of the defendants.  In addition, all of the defendants were given copies of documentation received from the lenders and servicing companies to substantiate the losses.  The government is unaware of any similar efforts being undertaken by the defendants, either collectively or individually.

As candidly admitted above, the government's proffered loss estimate is not precise.  The guidelines and applicable case law do not, however, require precision.  They merely require a reasonable estimation.

### C.   The Scheme To Defraud Involved Ten (10) Or More Victims

Both the government and the Probation Office contend the two (2) level enhancement authorized by USSG §2B1.1.(b)(2)(A) is applicable because the charged and agreed scheme involved ten (10) or more victims.  As noted in the Declaration of James C. Vach, the government identified twelve (12) lenders who extended loans on the basis of false and fraudulent information submitted by those participating in the scheme.  Vach Declaration at ¶ 3;  Dkt. No. 211.  Information recently developed to assist the court in establishing a reasonable estimate of the losses attributable to the fraud scheme identified ten (10) lenders or servicing companies reporting losses from loans extended on the basis of false and fraudulent information.  Vach Declaration at ¶ 5; Second Declaration of James C. Vach at ¶ 4; Dkt. No. 216.

### D.   Defendant Baydovskiy Was An Organizer Or Leader Of The Scheme

The government anticipates that Mr. Baydovskiy will argue that he was neither a leader nor an organizer of the scheme to avoid application of the four (4) level aggravating role enhancement.  This argument is inconsistent with both the agreed facts and the supplemental facts discussed in section II above.  Mr. Baydovskiy was a co-owner of Kobay and was instrumental in forming Nationwide.  He and co-defendant Alla Sobol conceived the plan of opening and operating an escrow company to further the scheme. They then recruited

Government's Sentencing Memorandum
Baydovskiy, Vladislav
Baydovskiy et al., CR-09-0084-MJP - 14

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

their spouses to oversee the day-to-day operations of Emerald City, thereby insuring control over how fraudulently obtained loan proceeds were dispersed.

## IV.   RECOMMENDATION & JUSTIFICATION

### A.      Criminal Fine, Restitution, Supervised Release

The government believes that Mr. Baydovskiy lacks the necessary resources to pay both a criminal fine and the mandatory restitution obligation to be sought by the government. Consequently, the government will not oppose a request that the fine be waived.

The charged conduct to which Mr. Baydovskiy pled guilty involved offenses "committed by fraud or deceit," imposing a mandatory restitution obligation.  18 U.S.C. §3663A(c)(1)(A)(ii).  Section 3663A(d) of the Mandatory Victim Restitution Act provides that "[a]n order of restitution under [the Act] shall be issued and enforced in accordance with section 3664.  18 U.S.C. § 3663A(d).  Determining the appropriate restitution amount in this case presents some legal and factual issues requiring supplemental briefing and testimony. This court has scheduled a joint restitution hearing for January 29, 2010.

Finally, the government concurs with the Probation Office's recommendation to impose a three year term of supervision.  Three years of oversight is necessary to reduce the likelihood of recidivism.

### B.      Term of Imprisonment

In consideration of the following factors set forth in 18 U.S.C. § 3553(a), together with an advisory guideline range of seventy (70) to eighty-seven (87) months as advocated by the government and the Probation Office, the government recommends that this Court sentence Defendant Vladislav Baydovskiy to seventy-eight (78) months of imprisonment.

### 1.      The Nature and Circumstances of the Offense

The means employed by Defendant Baydovskiy and his co-conspirators to perpetrate the mortgage fraud scheme charged in this case were not unique.  To the contrary, federal and state prosecutors nationwide are investigating and have charged numerous schemes involving the same, or similar, deceptive acts. http://www.fbi.gov/publications/fraud/mortgage_fraud08.htm.  The tremendous scale of the

Government's Sentencing Memorandum
Baydovskiy, Vladislav
Baydovskiy et al., CR-09-0084-MJP - 15

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

problem has led many to label mortgage fraud as a significant contributor to our nation's financial problems. Fraud perpetrated by those involved in the mortgage lending industry has caused massive losses to lenders and is responsible for the failure of banks and private lending institutions. Investors in mortgage backed securities have lost funds needed for income and retirement. Home values have been distorted by inflated appraisals leading to a shortage of affordable housing. Foreclosures caused by mortgage fraud have riddled neighborhoods with abandoned houses and properties in disrepair.

A consistent sustained increase in home values led to relaxed loan underwriting standards. Loan applications, appraisals, and real estate closing documents were not closely scrutinized because the residential real estate industry assumed the rising real estate values would insure that lenders would recoup their funds from the sale of the home if they had to foreclose. In addition, it was assumed that homeowners unable to afford their mortgage payments would simply re-finance based on the ever increasing value of their homes.

Several professionals in the residential real estate industry, including Defendant Baydovskiy and his co-defendants in this case, seized on opportunities presented by these market conditions. They took advantage of the decreased scrutiny and a rising market by orchestrating real estate transactions using fraudulently inflated prices, falsified borrower qualification documents, and sham closings to divert loan proceeds to themselves. Lenders were left with both unqualified borrowers lacking the resources to honor their loan commitment, and overvalued properties to securitize the debt. The well documented collapse of the residential real estate market exposed the fraud. Lenders could no longer look solely to the pledged properties to recover their losses.

The government anticipates that Defendant Baydovskiy and the remaining defendants to be sentenced in this case will argue that decreased scrutiny in the residential real estate lending markets mitigates their culpability. Any suggestion that this Court should discount a particular defendant's personal responsibility for preparing and submitting fraudulent documents and making false representations in an orchestrated effort to obtain loan proceeds should be summarily denied. There is no basis in the law or equity for the proposition that

Government's Sentencing Memorandum
Baydovskiy, Vladislav
Baydovskiy et al., CR-09-0084-MJP - 16

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

criminal conduct be excused because the victim failed to take adequate measures to protect themselves or their property.  The relaxed underwriting standards employed by lenders prior to collapse of the residential real estate market were neither an invitation to commit fraud nor an excuse for those unscrupulous enough to steal.

The particular scheme charged and admitted to by Mr. Baydovskiy, while not unique in its methodology, required the collaborative efforts of mortgage brokers, loan officers, accountants, and escrow closers.  Each played a vital role in developing, implementing and perpetuating the scheme.

## 2.    History and Characteristics of the Defendant

Mr. Baydovskiy has extensive experience in the mortgage lending business.  Drawing on their collective experience as loan officers in the late 1990s, Messrs. Baydovskiy and Kobzar formed Kobay Financial Corporation.  As discussed above, many of the fraudulent practices comprising the charged scheme in this case were conducted by Mr. Baydovskiy from the outset of Kobay's operations in 2000.  These practices continued unabated for over five years.

Faced with increased scrutiny from state regulators and a loss of lender options due to documented instances of fraud, Mr. Baydovskiy was undeterred.  He and Mr. Kobzar chose to continue their business operations under a new name.  They brought in a new business partner, co-defendant Alla Sobol, and began conducting business under the Nationwide Home Lending name.  They used Ms. Sobol's newly obtained mortgage broker's license in an effort to distance themselves from Kobay and responsibility for the fraudulent practices ascribed to its operations.

Adoption of the Nationwide name and their new affiliation with Ms. Sobol did not cause Messrs. Baydovskiy or Kobzar to alter the way in which they conducted their mortgage brokerage business.  To the contrary, Mr. Baydovskiy and Ms. Sobol formulated the plan to start an escrow company to close the loan transactions they were brokering.  The introduction of Emerald City Escrow as a means of diverting fraudulently obtained loan proceeds merely completed the scheme.  Both Mr. Baydovskiy and co-defendant Alla Sobol recruited their

Government's Sentencing Memorandum
Baydovskiy, Vladislav
Baydovskiy et al., CR-09-0084-MJP - 17

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

respective spouses to operate the escrow business.  The willingness of both to actively engage their spouses speaks directly to their character, underscoring the force of personal greed in guiding their decisions.

Finally, Mr. Baydovskiy's conduct in early 2009 following the closure of Emerald City and cessation of the charged scheme should be factored into this court's assessment of his character.  Unlike the actions of co-defendant Alla Sobol, who affirmatively withdrew from the scheme, Mr. Baydovskiy continued using many of the same fraudulent practices to solicit and obtain additional loan proceeds.  As outlined in the Declaration of Silvia Reyes, Mr. Baydovskiy submitted fraudulent applications to at least three credit unions in early 2009.  Unable to broker mortgage loans because he lacked the required license, he exhibited his resourcefulness by falsifying the qualifications of I.V., a third party, to obtain a $200,000 home equity line of credit.  The line of credit was immediately drawn down and the loan is now a total loss.

As noted in the parties' Plea Agreement, Mr. Baydovskiy agreed to cooperate fully in the government's investigation of the charged scheme.  He has honored that commitment by providing information related to the activities of his co-defendants as well as others in the mortgage industry.

### 3.  Reflect Seriousness of Offense, Promote Respect for the Law, and Provide Just Punishment

As noted in sub-section 1 above, the mortgage fraud scheme perpetrated by Mr. Baydovskiy and his co-conspirators was largely successful due to relaxed oversight by lenders.  Lenders relied, to their detriment, on the truthfulness of representations made by Mr. Baydovskiy and his co-conspirators regarding a borrower's purported qualifications and the value of the properties to be pledged as security for the fraudulently obtained loans.  Motivated by simple greed and the perceived reduced risk of detection, Mr. Baydovskiy and his colleagues were undeterred by ethical constraints to make true and accurate representations regarding property values and a prospective borrower's creditworthiness.

Government's Sentencing Memorandum
Baydovskiy, Vladislav
Baydovskiy et al., CR-09-0084-MJP - 18

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

The recommended seventy-eight (78) month term of imprisonment would signal to the entire real estate industry the seriousness with which fraudulent practices will be sanctioned. The standards of honesty and transparency so readily abused and ignored by Mr. Baydovskiy in this case would best be served by a significant term of imprisonment.  Judicial recognition that dishonest business practices will not be excused regardless of "market conditions" would be underscored by imposing the requested sentence.

### 4.      Afford Adequate Deterrence to Criminal Conduct

The government believes that this prosecution, together with a custodial sentence of the requested duration, should deter Mr. Baydovskiy from engaging in further criminal conduct.  An equally important consideration, however, is the deterrent effect this prosecution and the resulting sentences will have on the broader real estate and mortgage lending industries.  As discussed above, countless others employed in the mortgage lending industry profited from using many of the same fraudulent practices prosecuted in this case.[4]

These professionals presumably engaged in a risk analysis, concluding that the threat of detection and accountability was outweighed by the loan proceeds so readily stolen from lenders and unwitting borrowers.  The significant term of imprisonment sought by the government for Mr. Baydovskiy would signal to others in the industry an increased risk to engaging in similar fraudulent conduct, tipping the balance in favor of honest and transparent business dealings.

### 5.      Avoid Unwarranted Sentence Disparity Among Defendants

This court has sentenced defendants Alla Sobol, David Sobol, and Camie Byron to twenty-four (24) month terms of imprisonment.  The government had sought a forty-eight (48) month term for Ms. Sobol based in large part on her role as a leader and organizer of Nationwide and her recruitment of her husband to manage Emerald City Escrow.  Mr.

---

[4]The Mortgage Asset Research Institute's March 2009 report to the Mortgage Bankers Association reports that "fraud incidence is at an all-time high," and "[e]merging fraud trends are further draining lender, law enforcement, and consumer resources in the industry's most challenging times." http://www.marisolutions.com/resources-news/press-release-20090316.asp There were 63,713 mortgage fraud related suspicious activity reports filed with FinCEN in fiscal year 2008, compared to 17,127 such reports in fiscal year 2004 --an increase of 370%.

Government's Sentencing Memorandum
Baydovskiy, Vladislav
Baydovskiy et al., CR-09-0084-MJP - 19

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

Baydovskiy played an even greater role in the scheme.  He too was a leader and organizer of Nationwide and recruited his spouse to conduct escrow operations.  There are, however, several factors distinguishing Mr. Baydovskiy's participation from that of Ms. Sobol's.

First, as noted above, Ms. Sobol voluntarily withdrew from the scheme despite Mr. Baydovskiy's protestations that she continue.  Mr. Baydovskiy not only encouraged her continued participation, he carried on many of the same fraudulent practices using a newly formed escrow company and falsified applications for home equity lines of credit.

Second, the government's analysis of accounting records seized from the defendants' business entities and obtained from banks at which the defendants held accounts, indicates that Mr. Baydovskiy derived the greatest financial gain from the scheme.  This determination is supported by the government's seizure of approximately $2.4 million in assets believed to be acquired with fraudulently obtained loan proceeds.  Reyes Declaration at ¶ 6.

Finally, Mr. Baydovskiy was widely viewed by employees, lenders, and others in the mortgage industry as the head of both Kobay and Nationwide.  This perception is supported by co-defendant Kobzar's characterization of his partner's control over business operations.  Mr. Baydovskiy successfully exercised control over the financial affairs of both brokerage businesses.

Mr. Baydovskiy's role in the scheme is both qualitatively and quantitatively distinguishable from that played by both David Sobol and Camie Byron.  Ms. Byron was hired by Mr. Baydovskiy as an office assistant.  She had no prior experience in real estate or mortgage lending.  Nearly everything she learned about the business, including the fraudulent practices outlined in the parties agreed fact statement, was acquired directly or indirectly from Mr. Baydovskiy.  Similarly, Mr. Sobol had no prior experience conducting escrow operations before being recruited to manage Emerald City Escrow.  While he was an important player in the scheme, he closed transactions that had been brokered by his wife and her fellow business associates at Nationwide.

When viewed in its entirety, the government believes the material before this court supports the conclusion that Mr. Baydovskiy was an undisputed leader of the scheme.  His

Government's Sentencing Memorandum
Baydovskiy, Vladislav
Baydovskiy et al., CR-09-0084-MJP - 20

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1  efforts were essential to the continued operation of Kobay, Nationwide, and Emerald City.

2  Those efforts are worthy of the most severe sanctions to be imposed on any of the seven

3  defendants to come before the court.

4  ### V.  CONCLUSION

5     The mortgage fraud scheme perpetrated by Mr. Baydovskiy and his co-defendants

6  took advantage of market conditions that enabled those motivated by dishonest intentions to

7  reap significant benefits with very little risk of detection.  Fueled by greed, without any

8  apparent regard for ethical business dealings, Mr. Baydovskiy and his co-defendants were

9  undeterred in their collective pursuit for fraudulent loans.  It was not until the near collapse

10 of the real estate markets and the corresponding tightening of lending standards that the

11 defendants' activities were slowed.  The sentence this court will impose on Mr. Baydovskiy

12 provides an opportunity to send the message that mortgage fraud, particularly those who lead

13 intricate schemes to defraud, will be sanctioned as serious criminal conduct.  The

14 government's recommended sentence accomplishes this objective.

15     DATED this 14th day of December, 2009

16

17                                Respectfully submitted,

18                                JENNY A. DURKAN
                                   United States Attorney

19
                                   /s/ James D. Oesterle
20                                 JAMES D. OESTERLE
                                   WSBA # 16399
21                                 Assistant United States Attorney
                                   United States Attorney's Office
22                                 700 Stewart Street, Ste. 5220
                                   Seattle, WA 98101
23                                 Facsimile:  206-553-2502
                                   Phone:  206-553-5040
24                                 E-mail: jim.oesterle@usdoj.gov

25

26

27

28

Government's Sentencing Memorandum
Baydovskiy, Vladislav
Baydovskiy et al., CR-09-0084-MJP - 21

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

# CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on December 14, 2009 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the attorneys of record for the defendants.

/s/ James D. Oesterle
JAMES D. OESTERLE
WSBA # 16399
Assistant United States Attorney
United States Attorney's Office
700 Stewart Street, Ste. 5220
Seattle, WA 98101
Facsimile:  206-553-2502
Phone:  206-553-5040
E-mail: jim.oesterle@usdoj.gov

Government's Sentencing Memorandum
Baydovskiy, Vladislav
Baydovskiy et al., CR-09-0084-MJP - 22

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970