JUDGE MARSHA J. PECHMAN

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

UNITED STATES OF AMERICA,              )
                                        )
              Plaintiff,                )       NO. CR09-084MJP
                                        )
         v.                             )       DEFENDANT VLADISLAV
                                        )       BAYDOVSKIY'S SENTENCING
VLADISLAV BAYDOVSKIY,                   )       MEMORANDUM
                                        )
              Defendant.                )
_____    )

RICHARD J. TROBERMAN, P.S.
ATTORNEY AT LAW
1501 FOURTH AVENUE, SUITE 2150
SEATTLE, WASHINGTON 98101-3225
(206) 343-1111

# TABLE OF CONTENTS

I.   FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . .   4

II.  MAXIMUM STATUTORY PENALTY . . . . . . . . . . . . . . . . . . . . . . .   4

III. OBJECTIONS TO PRESENTENCE REPORT . . . . . . . . . . . . . . . .   4

IV.  GUIDELINES OFFENSE LEVEL AND SENTENCING RANGE . . . . .   5

V.   SENTENCING FACTORS . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5

VI.  SENTENCING RECOMMENDATION AND APPLICATION
     OF THE §3553(a) FACTORS . . . . . . . . . . . . . . . . . . . . . . . . . .   7

     A.   THE NATURE AND CIRCUMSTANCES OF THE OFFENSE
          AND THE CHARACTERISTICS OF THE OFFENDER . . . . . . . . . .   7

          1.  The Offense . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   7

          2.  History and Characteristics of the Defendant . . . . . . . . .   10

              FAMILY BACKGROUND . . . . . . . . . . . . . . . . . . . . .   10

              CHILDHOOD IN SOVIET UNION . . . . . . . . . . . . . . .   12

                  1.  Early Years . . . . . . . . . . . . . . . . . . . . . .   12
                  2.  Schooling . . . . . . . . . . . . . . . . . . . . . . .   13
                  3.  Relationship with Parents . . . . . . . . . . . . . .   14
                  4.  Anti-Semitism and Social Instability . . . . . . .   15

              RELOCATION TO THE UNITED STATES . . . . . . . . .   16

              EMPLOYMENT AND MARITAL HISTORY . . . . . . . . .   20

              CIRCUMSTANCES RELATED TO THE
              OFFENSE . . . . . . . . . . . . . . . . . . . . . . . . . . . .   21

              ACCEPTANCE OF RESPONSIBILITY . . . . . . . . . . .   23

              EMOTIONAL AND PHYSICAL CONDITION . . . . . . .   25

              LETTERS OF SUPPORT . . . . . . . . . . . . . . . . . . .   26

          3.  Cooperation. . . . . . . . . . . . . . . . . . . . . . . . . . . .   28

**DEFENDANT VLADISLAV BAYDOVSKIY'S**
**SENTENCING MEMORANDUM; CR09-084MJP - 2**

RICHARD J. TROBERMAN, P.S.
ATTORNEY AT LAW
1501 FOURTH AVENUE, SUITE 2150
SEATTLE, WASHINGTON 98101-3225
(206) 343-1111

| | B. | SERIOUSNESS OF THE OFFENSE; PROMOTING RESPECT FOR THE LAW; AND JUST PUNISHMENT. | 30 |
| | C. | THE NEED FOR ADEQUATE DETERRENCE. | 30 |
| | D. | THE NEED TO PROTECT THE PUBLIC. | 30 |
| | E. | THE NEED FOR REQUIRED MEDICAL CARE. | 30 |
| | F. | THE NEED TO AVOID UNWARRANTED SENTENCING DISPARITY. | 31 |
| VII. | | RESPONSE TO PROBATION RECOMMENDATION | 36 |
| | 1. | Count One | 36 |
| | 2. | Count Two | 37 |
| VIII. | | CONCLUSION | 38 |
| IX. | | EXHIBITS | 40 |

Drew Silver, *Part One: Reckless Strategies Doomed WaMu,* Seattle Times, October 25, 2009 . . . . . . . . . . . . . . . . . . . . . . . . . A-1

David Heath, *Part Two: Hometown Bank Turned Predatory,* Seattle Times, October 26, 2009 . . . . . . . . . . . . . . . . . . . . . . . . . A-2

LETTERS:

1. Vladislav Baydovskiy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B

2. Ludmilla Baydovskaya . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C

3. Julia Cooper and Albina Gnilopyat . . . . . . . . . . . . . . . . . . . . . . D

4. Bogdan Nalivaiko . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . E

5. Yury Gurevich . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F

6. Ilya Babinsky . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . G

7. Ludmila Perinova . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . H

8. Innessa Gurevich . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . I

**DEFENDANT VLADISLAV BAYDOVSKIY'S SENTENCING MEMORANDUM; CR09-084MJP - 3**

RICHARD J. TROBERMAN, P.S.
ATTORNEY AT LAW
1501 FOURTH AVENUE, SUITE 2150
SEATTLE, WASHINGTON 98101-3225
(206) 343-1111

## I. FACTUAL BACKGROUND.

On March 25, 2009, the defendant, Vladislav Baydovskiy, and several co-defendants, were charged by indictment with a variety of offenses, including bank, mail, and wire fraud.  Vlad and his wife were arrested in Los Angeles, California, on March 26, 2009, where they were on vacation with their oldest son.  Mr. Baydovskiy was ordered detained in Los Angeles, and was transported to this district on April 6, 2009. He has remained in custody, first in Los Angeles, and then at FDC-SeaTac, since his arrest.

On September 25, 2009, Mr. Baydovskiy pled guilty to a two count First Amended Superseding Information.  Count 1 charged him with Conspiracy to Commit Bank, Mail, and Wire Fraud in violation of 18 U.S.C. §371, and Count 2 charged him with Willfully Making and Subscribing a False Income Tax Return in violation of 26 U.S.C. §7206(I). Sentencing is scheduled before this Court at 1:30 p.m. on December 18, 2009.

## II. MAXIMUM STATUTORY PENALTY.

The maximum statutory penalty on Count 1 (a Class D felony) is a term of imprisonment of five (5) years; a fine of up to $250,000; a period of supervised release of three (3) years; and a mandatory penalty assessment of $100.  The maximum statutory penalty on Count 2 (a Class E felony) is a term of imprisonment of three (3) years; a fine of up to $100,000; a period of supervised release of one (1) year; and a mandatory penalty assessment of $100.

## III. OBJECTIONS TO THE PRESENTENCE REPORT.

Mr. Baydovskiy has no objections to the Presentence Report that affect the guidelines calculation.

RICHARD J. TROBERMAN, P.S.
ATTORNEY AT LAW
1501 FOURTH AVENUE, SUITE 2150
SEATTLE, WASHINGTON 98101-3225
(206) 343-1111

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## IV.  GUIDELINES OFFENSE LEVEL AND SENTENCING RANGE.

All parties agree that the Total Offense Level is 27, Criminal History Category I. With a Total Offense Level of 27, and Criminal History Category I, the sentencing guidelines range is 70-87 months, before any departures or variances.

## V.  SENTENCING FACTORS.

In order to uphold the constitutionality of the Sentencing Reform Act, the remedial decision in *United States v. Booker*, 543 U.S. 220 (2005), severed 18 U.S.C. §3553(b)(1) (the provision making application of the guidelines mandatory) from the SRA.  Thus, after *Booker*, a sentence within the guidelines range may not be necessary to achieve the Congressionally defined purposes of sentencing.  A district court's job is to impose "a sentence *sufficient, but not greater than necessary,* to comply with the purposes" of section 3553(a)(2).  The United States Supreme Court has made clear that reasonableness is the *appellate* standard of review in judging whether a district court has accomplished that task. *Rita v. United States,* 551 U.S. 338, 127 S.Ct. 2456, 168 L.Ed.2d 203 (2007).  However, the Supreme Court has also rejected the notion that a sentence that amounts to a substantial variance from the Guidelines needs to be justified by extraordinary circumstances, holding instead that appellate courts must review all sentences, both within and without the Guidelines range, under a differential abuse-of-discretion standard.  *Gall v. United States,* 552 U.S. 38, 128 S.Ct. 586, 591, 169 L.Ed.2d 445 (2007).

In determining the particular sentence to be imposed, the Court *shall* consider the nature and circumstances of the offense, and the characteristics of the defendant.  The Court shall also consider the need for the sentence (1) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

RICHARD J. TROBERMAN, P.S.
ATTORNEY AT LAW
1501 FOURTH AVENUE, SUITE 2150
SEATTLE, WASHINGTON 98101-3225
(206) 343-1111

(2) to afford adequate deterrence to criminal conduct; (3) to protect the public from further crimes of the defendant; (4) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; and (5) to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar offenses. Of paramount importance to any sentencing determination, however, is that all of these factors are subservient to the §3553(a) mandate to impose a sentence sufficient, <u>but not greater than necessary</u>, to comply with the statutory purposes of sentencing. And as *Rita* makes clear, traditional departure analysis under the guidelines survives post-*Booker*.

Prior to *Booker*, many of these factors were largely ignored, because they were incompatible with the Guidelines. As one Court observed,

> For example, under §3553(a)(1) a sentencing court must consider the "history and characteristics of the defendant." But under the guidelines, courts are generally forbidden to consider the defendant's age, U.S.S.G. §5H1.1, his education and vocational skills, §5H1.2, his mental and emotional condition, §5H1.3, his physical condition including alcohol or drug dependence, §5H1.4, his employment record, §5H1.5, his family ties and responsibilities, §5H1.6, his socio-economic status, §5H1.10, his civic and military contributions, §5H1.11, and his lack of guidance as a youth, §5H1.12. The guideline's prohibition of considering these factors cannot be squared with the §3553(a)(1) requirement that the court evaluate the "history and characteristics" of the defendant. The only aspect of a defendant's history that the guidelines permit courts to consider is criminal history.

*United States v. Ranum,* 353 F.Supp.2d 984 (E.D.Wis. 2005). Following *Booker*, however, courts must once again consider these factors along with the Guidelines and their policy statements.

**DEFENDANT VLADISLAV BAYDOVSKIY'S**
**SENTENCING MEMORANDUM; CR09-084MJP - 6**

RICHARD J. TROBERMAN, P.S.
ATTORNEY AT LAW
1501 FOURTH AVENUE, SUITE 2150
SEATTLE, WASHINGTON 98101-3225
(206) 343-1111

## VI. SENTENCING RECOMMENDATION AND APPLICATION OF THE §3553(a) FACTORS TO THIS CASE.

For the reasons set forth below, we submit that a sentence of thirty-six (36) months on Count 1, and six (6) months on Count 2, to be served concurrently, would be a sufficient--but not greater than necessary--sentence in this case.

### A.   THE NATURE AND CIRCUMSTANCES OF THE OFFENSE AND THE CHARACTERISTICS OF THE OFFENDER.

#### 1.   The Offense.

By any standards, this was a large scale fraud, committed over a period of years. The Court has received voluminous material detailing the offense in connection with the prior sentencings in this case, and no useful purpose would be served by repeating that material here.  However, there are differences in the conduct of the various defendants in this case that require further explanation.  There are also mitigating factors that bear further discussion.

Much has been made of the fact that certain members of the conspiracy engaged in funding loans through the use of "straw" buyers.  In this circumstance, a loan was taken out in the name of someone with good credit, who often had no knowledge that their name and credit were being used at all.  For example, Alla Sobol and Camie Byron were involved with a builder in Washougal, Washington.  The builder had overbuilt a development, and could not sell the properties.  He agreed with Alla and Camie to sell the properties at prices substantially below the listed price.  Alla purchased from a third party (Angela Shovutosky [sp?]) the names of people in Russia who apparently had good credit, and processed and obtained loans in their names, at the listed prices.  Camie helped process the loans for the listed amounts, and Alla and Camie pocketed the difference between the reduced price and the loan amount.  The loans were then allowed to go into

**DEFENDANT VLADISLAV BAYDOVSKIY'S**
**SENTENCING MEMORANDUM; CR09-084MJP - 7**

RICHARD J. TROBERMAN, P.S.
ATTORNEY AT LAW
1501 FOURTH AVENUE, SUITE 2150
SEATTLE, WASHINGTON 98101-3225
(206) 343-1111

foreclosure. The Russian "buyers" had no knowledge that properties had been purchased in their name. Alla and Camie even maintained a separate bank account at Wells Fargo to make a few monthly mortgage payments on some of the fictitious loans that they had obtained using straw buyers. Mr. Baydovskiy was not involved in such loans.[1]

Mr. Baydovskiy's criminal conduct, on the other hand, consisted mainly of him misrepresenting his customers' stated incomes and assets on "stated income" loan applications, and in some instances preparing false verification documents.[2] With few exceptions, he did not use straw buyers or wildly inflated appraisals. Instead he falsified borrower's incomes and assets. Vlad had built up a substantial clientele over the years of people for whom he had originated loans. These loans involved both the purchase of new homes, as well as refinancing existing loans. At first, a large percentage of these loans where completely legitimate, and Mr. Baydovskiy made a reasonable living from that business, based on the loan origination fees. Unfortunately, in a rising tide of home prices, it became more and more difficult for his customers to qualify for mortgage loans based on existing credit requirements, because incomes were not rising at the same pace as home prices.

In order to avoid choking off the credit supply, banks became more imaginative in

---

[1] Mr. Baydovskiy can recall, participating in, at most, three loans during his entire time at both Kobay and Nationwide where straw buyers were involved, and only one of those loans resulted in a loss to the lender. In each such loan in which he was involved, the straw buyer was fully aware of, and was a willing participant, in the loan.

[2] While there was a time that Mr. Baydovskiy was involved in falsifying loan verification documents, that practice later became unnecessary, as there came a time when the lenders no longer required any verification of the information provided. Late in the scheme, when the lenders once again began requiring verification of income and assets, Alla Sobol hired Cecelia Morales as a full time employee. Cecelia worked out of David Sobol's office at Emerald City Escrow, and her sole job was to create, modify, and falsify loan verification documents. She worked mostly on Alla's and Camie's loans. Vlad never used her.

DEFENDANT VLADISLAV BAYDOVSKIY'S
SENTENCING MEMORANDUM; CR09-084MJP - 8

RICHARD J. TROBERMAN, P.S.
ATTORNEY AT LAW
1501 FOURTH AVENUE, SUITE 2150
SEATTLE, WASHINGTON 98101-3225
(206) 343-1111

funding loans, while at the same time becoming far more lax in their lending standards. In their zeal to keep up with a market rapidly spinning out of control, most banks stopped requiring many forms of loan documentation and verification. These "stated income" loans or "no doc" loans, more commonly referred to in the industry as "liar's loans" fueled the ravenous mortgage loan frenzy. The vast majority of fraud committed by Mr. Baydovskiy involved such loans, where the borrower's income and/or assets were falsely inflated in order to qualify for the loan. These loans involved real people who were attempting to enter the booming real estate market for the purchase of a new home or for investment purposes, or who were attempting to refinance existing loans in order to withdraw equity from their existing property, and they were willing participants.

The lenders not only turned a blind eye to the liar's loans, they actually encouraged them. If a loan packet was submitted with insufficient stated income or assets to support a loan, the lender would often contact the loan originator and advise them that the stated income or assets needed to be "x" in order to approve the loan, and directed the loan originator to resubmit the package with "x", while at the same time assuring the loan originator that the original loan package would be shredded while they awaited to new figures. Other account representatives, armed with coffee, doughnuts and other perks, would routinely descend on Vlad's office to review his loan applications. Based on the size of the requested loan, they would tell Vlad to increase the borrower's income and assets by whatever amount was required to fund the loan. When the account reps were unsure as to the necessary ratios, they would jump on the phone and talk to their underwriters at their home offices, who would quickly run the numbers. Vlad would then increase the numbers on the applications as instructed by the account reps.

**DEFENDANT VLADISLAV BAYDOVSKIY'S**
**SENTENCING MEMORANDUM; CR09-084MJP - 9**

Even worse, the lenders encouraged the loan officers, through payment of higher commissions and other bonuses, to apply for up the riskiest form of loans. The riskier the loan, the higher interest rate to the bank.

This, of course, in no way excuses Mr. Baydovskiy's involvement in this fraud. But it does, hopefully, put it in some meaningful context. It should also be noted that many of these stated income loans that were based on applications that included inflated incomes or assets, did not result in losses to anyone. In the end, it was the collapse of the housing market that contributed to the size of the losses, because all of the loans were secured by property, although there is no escaping the fact that the fraud was also a factor.

**2. History and Characteristics of the Defendant.**

Vladislav A. Baydovskiy ("Vlad"), age 31, is currently in custody at FDC-SeaTac awaiting sentencing. He is married and has two children. His wife and co-defendant, Donata Baydovskiy, is also detained at FDC-SeaTac. His oldest son, Brandon Baydovskiy, 3, is being cared for by his parents, Arkidy and Ludmilla Baydovskiy, in Issaquah, Washington, while his second son, Dylan, is temporarily staying with his mother-in-law in Bellevue, Washington.

**FAMILY BACKGROUND**

Vlad is of Russian-Jewish origin. He was born in Gomel on January 10, 1978, in what was then southeastern Byelorussia SSR (Belarus). Belarus, which prior to the Russian Revolution was commonly known as White Russia, was one of the 15 provinces that comprised the old Soviet Union.

Vlad's father, Arkidy Baydovskiy, grew up on a collective farm near the village of Saratov. In an interview conducted in the preparation for this sentencing, Arkidy

**DEFENDANT VLADISLAV BAYDOVSKIY'S SENTENCING MEMORANDUM; CR09-084MJP - 10**

RICHARD J. TROBERMAN, P.S.
ATTORNEY AT LAW
1501 FOURTH AVENUE, SUITE 2150
SEATTLE, WASHINGTON 98101-3225
(206) 343-1111

Baydovskiy recalled:

> I spent most of my childhood in Saratov.  Despite his
> position as village agricultural director, my father was never
> in the Communist party.  It was rare for a Jewish person to
> gain that rank.  He was respected, however.  Education was
> rare in the deep village and my father's years at the
> Agricultural Academy made a difference.

Arkidy Baydovskiy adds:

> Conditions on the farm were still quite primitive.  There
> were 1200 workers.  We raised cows and pigs and chickens.
> Tractors and basic farm equipment were available but much
> work was still done by hand.  We had a few trucks to bring
> in supplies.  Most personal transportation was on horseback
> though there were a few Studebakers in the village.
>
> We had electric power for only a few hours each morning
> and night.  There were no stores and no asphalt.  The radios
> were battery-operated.  The economy had been destroyed
> during the war and the goal was to build it back up.  My
> parents put tremendous effort into their jobs.  They were up
> at 4:00 A.M. and didn't get into bed till midnight.
>
> ...It was a healthy life, at least compared to what my wife
> and son experienced growing up.  The fact that my parents
> held high positions helped diminish the anti-Jewish
> sentiment.

Vlad's mother Ludmilla (Louda) Finkelstein was born in Gomel in 1948.  The
Finkelsteins were one of a small number of Jewish families from the Gomel area who
survived the Holocaust.[3]

Louda's family returned to Gomel when she was eleven.  Louda recalls:

> The devastation from the war was unbelievable.  Gomel was
> a ruined city.  Much of the population, my family included,

---

[3]   The Jewish population of Gomel at the beginning of Wold War II numbered around
15,000.  Not long after invading Poland in 1939, the German army overran Belarus.  Nearly the
entire Jewish population were sent to concentration camps and later executed.   Ludmilla
Baydovskiy has little knowledge of how her parents escaped the death camps.

**DEFENDANT VLADISLAV BAYDOVSKIY'S
SENTENCING MEMORANDUM; CR09-084MJP - 11**

RICHARD J. TROBERMAN, P.S.
ATTORNEY AT LAW
1501 FOURTH AVENUE, SUITE 2150
SEATTLE, WASHINGTON 98101-3225
(206) 343-1111

> lived 10 to 15 to a room.  We were three generations all in one small place.  There was no kitchen and no bathroom.  There were stores but they were empty.  Life was day-to-day survival, trying to stay warm and hoping there would be something to eat.
>
> Surprisingly, the schools functioned and were very difficult.  I went to School #11 in Gomel and later to the music conservatory where I studied classical piano.  Mozart was my favorite though we were naturally required to study the Russian masters.

Louda and Arkidy met in 1962 at School #11.  They later became a couple and were married in 1972.  After marrying, they lived with Arkidy's parents in a two room apartment in the old part of Gomel.  Arkidy worked as a dental technician and Louda taught music to first and second graders.

### CHILDHOOD UPBRINGING IN THE SOVIET UNION

1. *The Early Years*

Vlad spent his early years living with his parents and paternal grandparents in central Gomel.  When Vlad was five, his mother developed breast cancer and was hospitalized for a lengthy period.  Later, his parents were assigned to a tiny apartment on the outskirts of Gomel, but Vlad continued to live in central Gomel with his grandparents.  He recalls that his grandparents were loving, and although he missed his parents, he did not feel neglected.  He attended School #27 and showed academic promise.  When Vlad was eight, his grandmother broke her hip and Vlad went back to live with his parents.  He found life on the edge of Gomel to be quite different from the old city.  The Baydovskiys lived in a 300 square foot apartment on the sixth floor of a nine story concrete apartment building that had been built in the 1970's.  Most of the local area residents were originally from the countryside, and very few had received more than a perfunctory education.

DEFENDANT VLADISLAV BAYDOVSKIY'S
SENTENCING MEMORANDUM; CR09-084MJP - 12

RICHARD J. TROBERMAN, P.S.
ATTORNEY AT LAW
1501 FOURTH AVENUE, SUITE 2150
SEATTLE, WASHINGTON 98101-3225
(206) 343-1111

Though Vlad's parents' combined salaries were respectable, income of any amount in the form of rubles usually did not cover the necessities of life. For decades after the war, shortages were endemic throughout the U.S.S.R. The problem was particularly bad in Belarus. Manufactured items in the state-controlled economy were in short supply and Vlad recalls his mother and father standing in line for 32 hour stretches in hopes of purchasing shoes. He explained it thusly:

> If you were able to buy shoes, which was a big "if," you always stocked up. That meant you bought your current size along with a couple of larger sizes. That way you might not need shoes for another three or four years.

The quality of Soviet construction left much to be desired. Their building's heating pipes, although almost new, cracked every winter and the residents went without heat, often for months at a time. Winters in Belarus were extremely cold. Vlad's mother describes:

> We stayed bundled up all the time wearing every layer of clothes we had. The residents would build bonfires in the courtyard in back of the building and huddle together to stay warm. It was crazy. The apartments were so cold that people would go outside to stay warm.

Like other Russians who had been through the war, Vlad's parents raised much of their own food in a tiny makeshift greenhouse. They grew cucumbers, cabbage, tomatoes and squash. Every fall Arkidy would rent a truck and drive to the Ukraine, returning with two five foot tall bags of potatoes which Louda would boil and serve with sauerkraut throughout the winter months.

2. *Schooling*

Vlad attended School #32 from grades 3 through 10. He reports that compared to American public schools, Soviet schools were phenomenally difficult. Although

DEFENDANT VLADISLAV BAYDOVSKIY'S
SENTENCING MEMORANDUM; CR09-084MJP - 13

mathematics and the sciences were stressed, students were also required to begin studying history, geography, Russian literature and politics at an early age. Eighth grade students were already learning calculus. Discipline was rigidly enforced and students were beaten to the ground with sticks for failing to complete homework assignments to the instructor's satisfaction. An attentive student, Vlad had to complete up to five hours of homework on a nightly basis. Louda, although well-intentioned and devoted to her son's welfare, was a harsh disciplinarian when it came to homework. She would stand over Vlad every night as he did his homework. A mistake as slight as smudging his paper would result in blows to his face and ears.

All students were required to have an extra-curricular activity. Vlad was assigned to ballet in which he participated until the age of 14. He was also a member of the Aero-Dynamics Club which carved airplanes and propellers out of wood.

Students were also required to attend the "Political Class" where Communist Party functionaries instructed the children in how to comply with the principles of Marxist-Leninism. As part of the instruction, children were encouraged to inform on parents who made anti-Soviet remarks. Given the difficult living conditions, it was perhaps inevitable that the struggling Belarussians would criticize the regime. Children who reported such criticism were rewarded with preferential treatment, which included appointment to key positions in the Young Pioneers group which could lead to eventual membership in the party.

3. *Relationship With His Parents*

Although Vlad's relationship with his parents improved greatly in later years after the family immigrated to the United States, in Belarus it was very difficult. Unlike his

**DEFENDANT VLADISLAV BAYDOVSKIY'S SENTENCING MEMORANDUM; CR09-084MJP - 14**

RICHARD J. TROBERMAN, P.S.
ATTORNEY AT LAW
1501 FOURTH AVENUE, SUITE 2150
SEATTLE, WASHINGTON 98101-3225
(206) 343-1111

grandparents who appear to have doted on him and were not overly concerned with his

performance in school, his parents were strict and exacting. Vlad's father Arkidy was a

heavy drinker who would typically not come home until 11:00 p.m. He and Louda argued

regularly and their fights were a household staple. Vlad, who desperately wanted to bond

with his father, recalls lying awake at night waiting for his father to come home from the

bars. On weekends, Arkidy would sometimes beat his son for the smallest of infractions.

4. *Experience With Anti-Semitism and Social Instability*

The Baydovskiys were the only Jewish family in their section of Gomel, a fact the

community never let them forget. They would frequently receive scrawled hate-mail in

which the favorite epithet was that "Jews" should "go back to Israel." At times Louda

opened their mailbox only to be confronted by dead rats and other vermin. Vlad was a

particular target due to his youth and vulnerability. Ludmilla Baydovskiy writes in her

appended letter to the Court:

> [Vlad] suffered moral and physical abuse that was common
> for Jewish children. Many times he was [beaten], bullied or
> robbed of his lunch money, and forced to go through the day
> hungry. Once, in a cold winter day he was found tied to a
> phone-pole, undressed and badly [beaten]. He had to spend
> three months in a hospital after that. There was no one we
> could complain to, since the teachers were abusing him as
> well. Once he forgot to put on his red scarf of a young
> pioneer. In front of the whole class, the teacher announced
> that Vlad has probably stopped wearing the scarf because he
> is planning on moving to Israel, and ordered him to go home
> and get his scarf without his coat, even though it was winter.

The attack which resulted in Vlad's three month hospitalization was perpetrated by

four adults. After stripping and beating him, they tied him to a telephone pole and wrote

foul epithets across his chest. It was dusk and just below freezing at the time of the

attack, and Vlad very possibly would not have survived the night. Fortunately, a neighbor

DEFENDANT VLADISLAV BAYDOVSKIY'S
SENTENCING MEMORANDUM; CR09-084MJP - 15

RICHARD J. TROBERMAN, P.S.
ATTORNEY AT LAW
1501 FOURTH AVENUE, SUITE 2150
SEATTLE, WASHINGTON 98101-3225
(206) 343-1111

tipped off his mother, who was frantically searching the neighborhood. During his extended hospital stay, Vlad received antibiotic therapy for a severe infection he had sustained. In a separate assault, Vlad was pushed out of a second story window, resulting in a broken arm and finger.

As the Soviet Union headed toward its dissolution, outlying provinces, including Belarussia, sought their independence. It gained its provisional autonomy in 1988 and its formal independence in 1991. Ironically, in the short term independence only made things worse for the average citizen. Ludmilla writes:

> The 90s period after the collapse of the Soviet Union, were really difficult times. There was hardly any food or clothes in stores, when there was food it was so expensive, we could hardly afford anything. It all reflected on Vlad's health, he lost a lot of weight and developed a life-threatening condition of asthma. For several years he was in a hospital. His doctor recommended getting him out of the country as soon as possible.

Due in part to the constant abuse and privation, Vlad developed a serious breathing problem which resulted in frequent trips to the emergency room. The Russian doctors were "stumped" and blamed it on Vlad's asthma or a possible heart problem. Years later, after his family had moved to U.S., Vlad was finally properly diagnosed as suffering from severe panic attacks.

### RELOCATION TO THE UNITED STATES

Vlad was 14 when he and his family arrived in Bellevue, Washington, in June of 1992. He was skeletal: close to 5'6", he weighed barely 80 pounds. Vlad recalls his feelings about coming to the United States:

> I was completely scared. I had never before been on an airplane and I had been fed anti-American propaganda since I was six years old. That picture of America that was

**DEFENDANT VLADISLAV BAYDOVSKIY'S
SENTENCING MEMORANDUM; CR09-084MJP - 16**

> painted in Russian schools was that the U.S. was mostly a
> country of hairy, drunken bums sleeping under bridges. One
> thing I knew was that I had to help my parents. I sensed
> that they were even more scared than me.

Upon arriving in Bellevue, the Baydovskiys moved into a low-income apartment complex. The whole family was disoriented and Arkidy, who had never before been unemployed, was beside himself. He spoke no English and faced the challenge of trying to procure employment as a dental technician. Like many immigrant families, the Baydovskiys refused to consider accepting any form of welfare.

Despite his own insecurities and his almost complete lack of English skills, Vlad set about helping his father get a job. For several months, he went job-hunting with his father on bicycles, the two of them scouring Bellevue and surrounding communities. With Vlad doing all of the talking, Arkidy finally secured a dental tech position where he earned $10 an hour. He had always been a skilled craftsman and was soon able to learn American dental techniques. Meanwhile, Louda found a part-time job in a day-care center.

Vlad's role in helping his parents to find work and acclimatize reflects the closeness of this family and Vlad's own strong survival instinct. Still deeply affected by his horrific childhood in Belarus, he was almost pathologically shy and had great difficulty meeting anyone's gaze.

Vlad enrolled at Tillicum Middle School in Bellevue. The transition was eased somewhat by the fact that American public schools were quite easy compared to the Soviet standard. Learning English was the first key obstacle. Vlad recalls:

> I was placed in an ESL class which, while somewhat
> helpful, didn't solve my problem. My solution was to buy
> a Russian-English dictionary. Our assigned reading in the

**DEFENDANT VLADISLAV BAYDOVSKIY'S**
**SENTENCING MEMORANDUM; CR09-084MJP - 17**

RICHARD J. TROBERMAN, P.S.
ATTORNEY AT LAW
1501 FOURTH AVENUE, SUITE 2150
SEATTLE, WASHINGTON 98101-3225
(206) 343-1111

eighth grade was *Tom Sawyer* and *Huckleberry Finn*.   To read these books I translated the English words to Russian word-for-word.   Every night I spent hours working my way through a few pages.   After six months I could speak and read English to some degree and after a year I was reasonably proficient.

After helping his father find a job, Vlad went to work himself.   His first summer in Washington he picked blueberries for nine hours a day at a local blueberry farm.   After that he found a dishwasher/busboy job at an Indian restaurant in Bellevue where he worked five hours a night.   He remembers:

I wanted to move up to McDonalds.   I'm not sure why; it was sort of like it symbolized America to me.   I knew I could do the job but they didn't want to hire me because my English still wasn't very good.   I kept going back and going back and they eventually gave in and hired me.   I stayed all the way through my junior year in high school and worked my way up to floor supervisor and then swing shift manager. If someone didn't show up I was always available and I took on every responsibility that came my way.

Vlad's parents recalled waiting fearfully every night for him to return home from work.   They eventually rented an apartment closer to the McDonald's during his junior year.   Vlad knew that his parents had made the difficult transition to American life for his benefit, and he was anxious to do everything in his power to help them pay their bills and find a real house.   He knew, however, that his debilitating shyness stood in his way.   He couldn't look others in the eye and would stare at the ground while talking.

Over time Vlad developed a conscious plan to improve his social skills.   He began to spend any available spare time at the Barnes & Noble bookstore near their apartment, where he would force himself to strike up conversations with other patrons.   He explains:

Sometimes I would greet people at the door.   I would say hello and ask them how they were doing.   It was terribly hard at first and several times I ran back to our apartment.

RICHARD J. TROBERMAN, P.S.
ATTORNEY AT LAW
1501 FOURTH AVENUE, SUITE 2150
SEATTLE, WASHINGTON 98101-3225
(206) 343-1111

> But I kept going back to try again…   This is how I learned
> to talk to people.  If I saw a person reading a book on golf,
> I'd try to get them to tell me something about the game.  I
> know it sounds strange but I really wanted to learn to relax
> around people.  My life in Washington was nothing like in
> Gomel.  People were pretty friendly and could care less that
> I was Jewish.

Vlad also read a number of self-help books on how to acquire self-confidence in everyday life situations.  He recalls reading a biography which described in detail Abraham Lincoln's early business and political failures prior to going to Washington. Although he was still prone to occasional panic attacks, Vlad slowly began to gain some measure of confidence.

On the advice of a cousin, after graduating from Tillicum Middle School, Vlad decided to attend Northwest Yeshiva High School, a Jewish day school in nearby Mercer Island.  Given the strict prohibition on practicing the Jewish faith in the Soviet Union, Vlad at first found it awkward and even intimidating to study in a faith-based environment. He transferred back to public school for a semester but then returned to the Yeshiva, where he gradually formed a close bond with the school administrator, Rabbi Fox.  Vlad paid his own tuition, first with his McDonald's earnings and later with commissions he earned selling electronic equipment at Circuit City in Bellevue.  He graduated from Northwest Yeshiva in 1997 and was accepted by the University of Washington as a Finance and Marketing major.

Through careful conservation, Vlad's parents were able to purchase a townhome in Issaquah in 1996.  They felt insecure at the thought of carrying a home loan and resolved to pay off their mortgage completely as soon as they were able.  In addition to his regular dental tech job, Arkidy started a commercial janitorial service.  For the next

**DEFENDANT VLADISLAV BAYDOVSKIY'S**
**SENTENCING MEMORANDUM; CR09-084MJP - 19**

RICHARD J. TROBERMAN, P.S.
ATTORNEY AT LAW
1501 FOURTH AVENUE, SUITE 2150
SEATTLE, WASHINGTON 98101-3225
(206) 343-1111

four years he, Louda, and Vlad cleaned banks and car dealerships from 7:00 p.m. to midnight in the Lynnwood area. With these earnings, the Baydovskiys were able to pay off their home completely by the end of 2000.

### EMPLOYMENT AND MARITAL HISTORY

While enrolled at the University of Washington, Vlad lived at home and paid for his books and tuition with commissions he earned selling cell phones at a company called The Future Shop. He did well in his coursework and maintained a B+ average.

In his sophomore year, Vlad met co-defendant Victor Kobzar who was also a student. The two young men became friends and took a scuba diving class together. They decided to start a business purchasing and refurbishing condominium homes, which they would then resell for a profit. Between 1999 and 2001 they purchased and resold around a dozen condos for small profits.

In this practical, hands-on manner, Vlad learned the basics of the real estate and loan origination business. He worked at various mortgage companies, first as a loan processor and then as a loan officer. In 2000, Vlad and Victor opened Kobay Financial Corporation in Bellevue. As his workload increased, he had less time for his classes and he withdrew from University of Washington without completing his degree. He immersed himself in real estate and developed a network of hundreds of contacts. Kobay Financial opened satellite offices in Woodland Hills, California and in Scottsdale, Arizona. In 2006, Vlad and Victor Kobzar opened Nationwide Home Lending with Alla Sobol.

In 2002, Vlad was introduced to his future wife, Donata Brenner, by a friend of his father. Donata, who was born in the former U.S.S.R., had immigrated with her family to Israel as a child.

RICHARD J. TROBERMAN, P.S.
ATTORNEY AT LAW
1501 FOURTH AVENUE, SUITE 2150
SEATTLE, WASHINGTON 98101-3225
(206) 343-1111

Vlad and Donata were married in Washington in September of 2003. Their first son Brandon was born in 2006 followed by their second child Dylan 18 months later. Despite his own traumatic childhood, Vlad bonded easily with his sons. Albina Gnilopyat, the proprietor of Rainbow Day Care and Preschool in Bellevue, observes in an appended letter to the Court:

> We...know Vladislav as a father of Brandon Baydovskiy, 3 years old boy, who was attending our Rainbow Day Care and Preschool...from January 2008 through March 2009. Based on our opinion as child care providers, Vladislav is a great father, who always was showing huge concern, attention, and love for his child. He would always ask questions about Brandon's day, his feelings, friends, and activities. Brandon showed a big love to his father as well.

> Vladislav was...very nice to all other parents in the child care... He would chat with them about their children and how they deal with different aspects of their daily life. ...everybody could see how much Vladislav loved Brandon and how much Brandon loved his dad. It was a really beautiful and heart warming picture to see.

> Vladislav was very nice to all the teachers in our child care center... He would always say how thankful he was for all our care, attention and teaching...and how much he appreciated our hard work...

In any conversation with Vlad, his love for his children is palpable. He misses them intensely and lives in anticipation of their weekend visits at the FDC. He now fully understands that family is far more important than any material gain and he has pledged to never again do anything that might jeopardize his ability to be home with his children.

## CIRCUMSTANCES RELATED TO THE OFFENSE

At the time of his offense conduct, Vlad had worked his way up from being a neophyte in the loan business to a top-producing loan officer in a relatively short period of time. The same terrified boy who had immigrated to the United States in 1992, had

DEFENDANT VLADISLAV BAYDOVSKIY'S
SENTENCING MEMORANDUM; CR09-084MJP - 21

RICHARD J. TROBERMAN, P.S.
ATTORNEY AT LAW
1501 FOURTH AVENUE, SUITE 2150
SEATTLE, WASHINGTON 98101-3225
(206) 343-1111

through hard work, self-improvement and persistence, chalked up a series of impressive accomplishments in a relatively short period of time.

Based on the nature of his offense, it would be easy to cast a skeptical eye on all of Vlad's achievements and conclude that all of his success was due to fraud. The fact is, however, that based on his intelligence and his tremendous work ethic and drive, Vlad initially achieved success without bending the law. Unfortunately, he, like thousands of other loan officers across the country, became caught up in an increasingly flawed system. To his downfall, Vlad applied the same energy and desire to succeed that had worked so well for him in the past to the ever escalating fraud scheme.

To understand the loan environment in which Vlad worked, and which led to his downfall, it is helpful to take a "bird's eye" view of the mortgage industry between 1999 and the economic collapse of 2008. As home prices steadily rose, increasing numbers of potential homebuyers found themselves unable to afford traditional 30 year fixed interest loans based on traditional lending standards, which required full disclosure of a potential buyer's financial state. In order to open up substantial new markets for home loans and home equity loans, banks and investment banks including Lehman Bros., Washington Mutual, Countrywide, Wachovia, and IndyMac, among others, created various high-risk, "easy access" mortgage instruments. Among these were the now notorious "sub-prime" loans, various "low doc" and "no doc" loan instruments (also known as "stated income" loans), a dizzying array of Adjustable Rate Mortgages (ARM's) and the Interest Only Loan. Perhaps the most notorious of all the "high-risk" bait being dangled by the policy makers at the banks and investment banks was the Negative Amortization Loan, in which the purchaser paid only a small percentage of his or her interest rate as part of his monthly

DEFENDANT VLADISLAV BAYDOVSKIY'S
SENTENCING MEMORANDUM; CR09-084MJP - 22

RICHARD J. TROBERMAN, P.S.
ATTORNEY AT LAW
1501 FOURTH AVENUE, SUITE 2150
SEATTLE, WASHINGTON 98101-3225
(206) 343-1111

payment which resulted in the owner's equity decreasing inexorably on a monthly basis while the lender's stake in the property increased artificially.

The above lending institutions, most or all of which are now defunct, pushed these new loans hard by structuring in various incentives for their managers, account representatives and underwriters. In effect, nearly everyone involved in closing one of the new exotic loan packages earned a higher commission than he or she would have made on a traditional 30 year fixed-rate mortgage. As time passed, the above practices trickled down and numerous smaller lenders began offering similar high-risk loan packages as well.

The banks weren't concerned with risk--only profit--because they knew they were going to sell the loan to someone else, usually within days of funding the loan. See, *e.g.,* Drew Silver, *Part One: Reckless Strategies Doomed WaMu,* and David Heath, *Part Two: Hometown Bank Turned Predatory,* Seattle Times, October 25 and 26, 2009, attached hereto as Exhibit A-1 and A-2.

### ACCEPTANCE OF RESPONSIBILITY

Vlad fully recognizes that the lenders' collusion, while integral to the success of the fraud, in no way justifies his participation in the fraud scheme. That is why he did not put the government to its proof, and why he chose to plead guilty. He is also aware of the illegality of failing to declare his wife Donata's true income on their 2006 tax return, and he regrets this criminal conduct as well.

In many hours of discussion with Vlad, one is struck by the depth and sincerity of his contrition. There is no question that he genuinely regrets having broken the law. He is forthright in admitting that his obsession with luxury items and "creature comforts" during this period was misguided and shallow. In the nine months since his arrest, he has

**DEFENDANT VLADISLAV BAYDOVSKIY'S SENTENCING MEMORANDUM; CR09-084MJP - 23**

RICHARD J. TROBERMAN, P.S.
ATTORNEY AT LAW
1501 FOURTH AVENUE, SUITE 2150
SEATTLE, WASHINGTON 98101-3225
(206) 343-1111

done a great deal of soul-searching and he realizes that his family and their real welfare, which is measured in time spent with children and commitment to their activities, is far more important than the material acquisition he formerly sought.   This is perhaps best illustrated in a letter Vlad wrote to the undersigned counsel prior to his guilty plea in this case.   The letter was written after Vlad had given his proffer, but before we had negotiated a plea agreement, and touched on many things that were on his mind at the time.  The letter included the following passage:

> Rich, I know that you will do everything possible to get a best outcome from this case for me, but I am scared.  And I'm scared because it is so hard being here, mentally and emotionally.  Maybe for some people its no big deal, but for me it is a torture every single day!  Its a torture because I still can't come to the realization that I was such a freaking idiot, that I gave up the most precious things in life, like being with my kids and seeing them grow up, and being with my family and I traded that for what?  For stupid money which has become meaningless for me!  Why?  I ask myself that question a million times a day -- its a mental torture.  I gave up everything so I can have money -- but its not where happiness is.  If I could do it all over again I would never ever ever do what I did -- I would be more happy and satisfied working at McDonalds for $10 an hour, but being with my family.  The problem was, I did not understand that at that time.  I just want one more chance to make my life right, and have my priorities straight.  I know 100% that this is my first and last time being faced with any kind of criminal prosecution.  I will never never give up my family, my sons, my freedom for any amount of money.  Nothing is worth this -- Nothing!
>
> Rich, I'm sorry to go into things in this letter that you probably do not care about, but I have nobody else to tell it to, and its all bottled up inside me.

It is clear from this letter that Vlad now has a much better appreciation for what really matters in life, and it is unlikely that he will ever again appear in front of another court in similar circumstances.

**DEFENDANT VLADISLAV BAYDOVSKIY'S**
**SENTENCING MEMORANDUM; CR09-084MJP - 24**

RICHARD J. TROBERMAN, P.S.
ATTORNEY AT LAW
1501 FOURTH AVENUE, SUITE 2150
SEATTLE, WASHINGTON 98101-3225
(206) 343-1111

Similarly, his mother Ludmilla recounts in her letter:

> First time Vlad call me from prison, he was crying and
> asking our forgiveness for all the pain he is causing us.  On
> that day he promised to only tell the truth from now on.  He
> keeps asking our forgiveness in every letter and visiting and
> telling that he can not forgive himself for the mistakes he
> made.  He now understands that happiness is not in money,
> cars or houses, but with his family, his children.  This was
> the first and last mistake that he made in his life, and no
> amount on money will ever get him to do anything wrong
> again.
>
> I believe him.  As a mother, I can feel when he is telling the
> truth, and he speaks straight from the heart.
>
> Your Honor, I am begging you to believe me that Vlad's
> remorse is sincere....  We are caring for two small children
> (ages 2 and 4) and both our elderly fathers (ages 82 and 87).
> Vlad is our only son and the only one we can rely on for any
> kind of support.  We don't know how to survive without
> him.

It would not be hyperbole to describe Vlad as a "fish out of water" in the SeaTac detention center.  He spends his time alone reading, and has established few friendships with any of the other inmates.  He phones his parents twice a day and lives in anticipation of their weekly visits when he spends time with his sons.  He lives for that day when he will be able to return home and start all over again from an honest foundation, even if it means working at menial jobs.

### EMOTIONAL AND PHYSICAL CONDITION

As a child in Belarus, Vlad Baydovskiy was prone to severe panic attacks in which he was unable to breathe.  These attacks required frequent hospitalizations and were misdiagnosed as either asthma or a mysterious heart ailment.  Once he relocated to America, these attacks diminished in frequency and for a time stopped entirely.  With the mounting stress of his career as a loan officer, the attacks returned and were accompanied

DEFENDANT VLADISLAV BAYDOVSKIY'S
SENTENCING MEMORANDUM; CR09-084MJP - 25

RICHARD J. TROBERMAN, P.S.
ATTORNEY AT LAW
1501 FOURTH AVENUE, SUITE 2150
SEATTLE, WASHINGTON 98101-3225
(206) 343-1111

by mounting depression.

In 2001, Vlad vacationed with his parents in the Dominican Republic.  There he suffered nightly panic attacks and felt as though he could not breathe.  After returning to the U.S., the attacks subsided but were replaced by ongoing depression.  He sought medical help and was prescribed Zoloft for the next several years.

Vlad's marriage to Donata in 2003 helped him achieve some stability, but over time the panic attacks returned.  His condition was finally diagnosed in 2007.  In moments of panic, his airwaves would spasm which triggered his inability to breathe.  He was prescribed Xanax for anxiety at the Redmond Mental Health Center in Redmond, Washington (see PSI, Pgs. 18-19, ¶¶81-82).  Although the Xanax helped with the panic and anxiety, Vlad soon began mixing it with large amounts of vodka, which resulted in intoxication and a resulting sense of numbness.  He also abused pain-killers for a period of time in an effort to occlude his mounting sense of despair.  Vlad continued to abuse Xanax and alcohol up until his arrest in March of this year.

Vlad is now sober and in touch with his feelings.  He knows now that fancy homes and luxury automobiles certainly did not (and will not) translate into happiness and -- although he was obviously very close to his children -- regrets that he did not spend even more time with them in the period prior to his arrest.  Vlad is also aware that he still must find a way to deal fully with the residue of emotional problems that plague him from the years of abuse he suffered as a child in Belarus.  He believes he would profit from psychotherapeutic and rehabilitative counseling during his time in custody.

### LETTERS OF SUPPORT

About a half dozen character letters have been submitted in support of Vlad by his

**DEFENDANT VLADISLAV BAYDOVSKIY'S**
**SENTENCING MEMORANDUM; CR09-084MJP - 26**

RICHARD J. TROBERMAN, P.S.
ATTORNEY AT LAW
1501 FOURTH AVENUE, SUITE 2150
SEATTLE, WASHINGTON 98101-3225
(206) 343-1111

friends, family and others who know him.  These letters depict his closeness to his wife, children and parents, and above all, his remorse for the acts that have led to his present situation.  The letters are appended, and some are excerpted below.

Family friend Innessa Gurevich writes:

> I am writing on behalf of my nephew, Vladislav.  I have known him since he was born... I know that he is a devoted family man with two children that need him.  If he is incarcerated for a long period of time, I am sure that his children will be affected negatively...  Vladislav is a kind and gentle soul who has worked hard for everything he has for as long as I can remember.  I know that his biggest fear right now is not being there for his two sons and wife due to the mistakes he has made.  I am sure that if he is given the opportunity to come home to his family, he would not make the same mistakes again and would do nothing more than work hard to provide for his wife and kids.

Vlad's cousin Yury Gurevich states in his letter:

> Vladislav is a wonderful human being with a kind and charitable heart and it would be a large loss for my family and I not having him around for a long period of time.  I also fear of the negative effect that his incarceration would have on his two young sons and his lovely wife.  His children need their father so that they can grow up with a positive and strong male role model.

> I truly believe after communicating with him...that he is truly regretful of his mistakes and would give anything to take them back.

Albina Gnilopyat adds:

> If Vladislav be sentenced, Brandon would really have a big loss.  Little boy would lose that special warmth and love, which only father can give to his child... Our opinion is that Vladislav Baydovskiy is one of the best fathers and persons we have known through our long experience, since year of 1999, working as child care providers and communicating with many different parents.  We strongly believe that Vladislav has learned from his mistake and case calls for compassion in sentencing.

RICHARD J. TROBERMAN, P.S.
ATTORNEY AT LAW
1501 FOURTH AVENUE, SUITE 2150
SEATTLE, WASHINGTON 98101-3225
(206) 343-1111

Family friend Ludmila Perminova writes to the Court:

> All this twelve years we have very close relationship and
> Vladislav dear for my, like son, because he grew up on my
> eyes.  He is kind, honest and sympathetic young man.
> When I asked him any kind of help he always did it for
> my...

> Vladislav is very loyal son.  I saw his relationship with
> parents with love and tenderness.  He always try to help
> them.  I felt very happy, that my friends have very
> sympathetic son.  He is very good husband and loving
> father.  If Vladislav be sentenced, his parents will be loss
> support, because his mother is sick, and they are caring for
> two small children and two elderly fathers.

> Vladislav mother often read his letters and we are crying
> together.  He ask forgiveness from parents and promise that
> it never happen again and he always will be lives honestly
> and he never will make those mistakes in his life again.

> Your Honor, I know Vladislav very good and believe that
> his remorse is sincere.

### 3. Cooperation.

Pursuant to the Plea Agreement, Mr. Baydovskiy, like his co-defendants, cooperated not only in the government's investigation of this case, but also in the government's investigation of other individuals and entities involved in similar conduct. Although the Plea Agreement contemplates that there will be no motion for a downward departure pursuant to U.S.S.G. §5K1.1, the Court can, and should, consider Mr. Baydovskiy's cooperation under the 3553(a) factors.

During the sentencing of co-defendant Alla Sobol, both Ms. Sobol's counsel and government counsel stressed the importance of the timing of Ms. Sobol's cooperation, and this was clearly something that the Court took into consideration in fashioning Ms. Sobol's sentence.  Vlad also offered to cooperate very early in this case.  In fact, immediately

**DEFENDANT VLADISLAV BAYDOVSKIY'S**
**SENTENCING MEMORANDUM; CR09-084MJP - 28**

RICHARD J. TROBERMAN, P.S.
ATTORNEY AT LAW
1501 FOURTH AVENUE, SUITE 2150
SEATTLE, WASHINGTON 98101-3225
(206) 343-1111

following his arrest in Los Angeles, he communicated his desire to cooperate to his appointed counsel, who notified the U.S. Attorneys Office in Los Angeles. Unfortunately, Vlad was told that there was no one in Los Angeles he could speak to about the case, and that any cooperation on his part would have to wait until he was transported to Seattle.

When Vlad arrived in Seattle he told his appointed counsel (Peter Mazzone) that he wanted to cooperate and Mr. Mazzone so informed the government. Mr. Mazzone, however, felt--quite properly--that he needed to educate himself about the case before he would subject his client to a proffer. The proffer was finally scheduled in late May, but due to a substitution of counsel, the proffer was postponed. As soon as the undersigned counsel made his appearance, the government was notified that it was still Mr. Baydovskiy's intent to cooperate, but that some additional time would be needed for me to familiarize myself with the case. Thus, the delays in scheduling Mr. Baydovskiy's proffer were not of his making. Had it been up to him, he would have proffered within days of his arrest.

It is also important to note that Mr. Baydovskiy was far more candid during his proffer than were Ms. Byron and Ms. Sobol. Indeed, the case agents complimented him on his candor following his proffer. On the other hand, we are informed and believe that both Ms. Byron and Ms. Sobol initially greatly minimized their own involvement in the conspiracy, and that it took many proffer sessions from each before the government felt that it had obtained a more accurate picture of the true scope of their involvement. Moreover, according to law enforcement reports provided to the defendant, Ms. Byron initially completely denied any knowledge of, or involvement in, any fraud. Similarly, Ms. Sobel's initial proffer contained many statements that were later determined to be

**DEFENDANT VLADISLAV BAYDOVSKIY'S**
**SENTENCING MEMORANDUM; CR09-084MJP - 29**

RICHARD J. TROBERMAN, P.S.
ATTORNEY AT LAW
1501 FOURTH AVENUE, SUITE 2150
SEATTLE, WASHINGTON 98101-3225
(206) 343-1111

inaccurate or untruthful.

**B.    THE SERIOUSNESS OF THE OFFENSE; PROMOTING RESPECT FOR THE LAW;
AND JUST PUNISHMENT.**

To be sure, the offense to which Mr. Baydovskiy has pled guilty is a serious offense.    However, any sentence significantly beyond that given to his co-defendants would not be just punishment, nor would it promote respect for the law.

**C.    THE NEED FOR THE SENTENCE TO AFFORD ADEQUATE DETERRENCE TO
CRIMINAL CONDUCT.**

We submit that a three year prison sentence will serve as an adequate deterrent. It is unlikely that others will be inclined to engage in this type of conduct if they realize that the consequences include a lengthy prison sentence.

**D.    THE NEED TO PROTECT THE PUBLIC FROM FURTHER CRIMES BY MR. BAYDOVSKIY.**

The likelihood of recidivism by Mr. Baydovskiy is low.    At age 31, this is his first encounter with the criminal justice system.    Based on the responsible way he has responded to these charges, including his cooperation and early plea, acceptance of responsibility and remorse, there is no reason to believe that he will ever again engage in illegal conduct.    Commenting on the importance and value of a defendant's cooperation, the United States Supreme Court has observed that

> "Few facts available to a sentencing judge are more relevant
> to "the likelihood that [a defendant] will transgress no more,
> the hope that he may respond to rehabilitative efforts to
> assist with a lawful future career, [and] the degree to which
> he does or does not deem himself at war with society."

*United States v. Roberts,* 445 U.S. 552, 558, 100 S.Ct. 1358, 63 L.Ed.2d 622 (1980).

**E.    THE NEED TO PROVIDE THE DEFENDANT WITH REQUIRED MEDICAL CARE.**

There are no significant medical issues in this case.

**DEFENDANT VLADISLAV BAYDOVSKIY'S
SENTENCING MEMORANDUM; CR09-084MJP - 30**

F.    THE NEED TO AVOID UNWARRANTED SENTENCING DISPARITY.

18 U.S.C. §3553(a)(6) directs the Court to consider the need to avoid unwarranted sentence disparities "among defendants with similar records who have been found guilty of similar conduct." Even prior to *Booker,* it had been held that a downward departure from the sentencing guidelines was appropriate where the imposition of a standard range sentence would create a substantial unjustified disparity: "Downward departure to equalize sentencing disparity is a proper ground for departure under appropriate circumstances." *United States v. Daas,* 198 F.3d 1167 (9th Cir. 1999), *cert. denied,* 531 U.S. 999 (2000),

> The purpose of the Sentencing Commission was to establish Guidelines that "avoid[] unwarranted sentencing disparities among defendants with similar [criminal] records who have been *found guilty* of similar criminal conduct. 28 U.S.C. 991(b)(1)(B). In drafting the Guidelines, the Commission "sought reasonable uniformity in sentencing by narrowing the wide disparity in sentences imposed for similar criminal offenses committed by similar offenders." U.S.S.G. Ch. 1., Pt. A, Intro. ¶3, at 2.

*United States v. Banuelos-Rodriguez,* 215 F.3d 989 (9th Cir. 2000). *Accord, United States v. Caperna,* 251 F.3d 827 (9th Cir. 2001).

In the present case, the Court has previously sentenced four defendants, all of whom pled guilty to the identical fraud conspiracy. Sandra Thorpe, whose involvement was minimal, received a probationary sentence. Camie Byron, David Sobol, and Alla Sobol each received sentences of twenty-four (24) months. While it was argued by their counsel that these individuals were less culpable than Mr. Baydovskiy (a point with which we do not agree), one inescapable fact is that their sentencing guidelines scores were identical, or nearly identical, to the guidelines score for Mr. Baydovskiy.

For Alla Sobol, the guideline calculation was <u>exactly the same</u> as for Mr.

RICHARD J. TROBERMAN, P.S.
ATTORNEY AT LAW
1501 FOURTH AVENUE, SUITE 2150
SEATTLE, WASHINGTON 98101-3225
(206) 343-1111

Baydovskiy: 70-87 months (based on a Total Offense Level of 27, and a Criminal History Category I).  For David Sobol, the guideline calculation was <u>one level lower</u> than for Mr. Baydovskiy:  63-78 months (based on a Total Offense Level of 26, and Criminal History Category I).  The Total Offense Level for Camie Byron was 23, but she was in Criminal History Category II due to prior criminal convictions.  Thus, her guideline sentencing range was 51-63 months.  However, while the guidelines calculations (which were based on the same factors that apply to Mr. Baydovskiy, including loss amount, number of victims, and role in the offense) were virtually the same, the guideline sentencing ranges for Alla Sobol, David Sobol, and Camie Byron were each capped at 60 months, due to the statutory maximum penalty.

Mr. Baydovskiy also pled guilty to a tax count, which increases his statutory maximum exposure from five years to eight years.[4]  But any suggestion that his plea to a tax count somehow makes him more culpable than Alla Sobol, David Sobol, or Camie Byron in the fraud scheme should be summarily rejected, because <u>every</u> defendant in this case was guilty of failing to report some portion of the income they derived from the fraud.  If this assertion is not true, we implore the government to refute it, but we remain confident that no such challenge can be made.  Indeed, the unreported income derived by Alla and David Sobol far exceeded the unreported income by Mr. Baydovskiy.  Moreover, unlike Alla and David Sobol, who concealed their ill-gotten gains by diverting money from escrow closings to pay for their personal expenses and other expensive items, Mr. Baydovskiy did not try to hide his income.

---

[4]  We believe that it has long been the unwritten policy of the United States Attorneys Office in this district that if the IRS is involved in a criminal investigation, and the facts support it, a tax count is to be included in the plea agreement of at least one defendant in every such case.

RICHARD J. TROBERMAN, P.S.
ATTORNEY AT LAW
1501 FOURTH AVENUE, SUITE 2150
SEATTLE, WASHINGTON 98101-3225
(206) 343-1111

The fact is that Count 2 was made part of the plea agreement so that the government would have some room to argue that Mr. Baydovskiy was more culpable than the defendants who pled only to the fraud count. This was done because at the time Mr. Baydovskiy entered his plea, the government did not know if it would be recommending up to the sixty months statutory maximum for Alla, David, or Camie. If it did, or if the Court sentenced any of those defendants to 60 months, the government wanted to be able to argue for a more severe sentence for Mr. Baydovskiy. But the potential for a more severe sentence was limited by the plea agreement in that instance to a sentence that would be at most sixty percent more severe (60 months vs. 96 months). Now that Alla, David and Camie have been sentenced to 24 months, a sentence recognizing that--in the government's view--Mr. Baydovskiy was up to sixty (60%) percent more culpable would result in a sentence of 38 months.

It was easy for Ms. Byron, Ms. Sobol, and Mr. Sobol to shift the blame to Mr. Baydovskiy at their sentencing hearings, because he wasn't here to defend himself. As a result, the Court heard only half the story at those hearings. The fact is that Alla Sobol was every bit, if not more, culpable then Mr. Baydovskiy in the fraud. Indeed, the government has previously represented to counsel that it viewed Alla, Victor, and Vlad as co-equals. In its Sentencing Memorandum re Alla Sobol, the government describes her involvement as:

> Defendant Alla Sobol's role in the charged scheme included operating Nationwide under her mortgage brokers license and participating in efforts to form and operate Emerald City Escrow under the managerial supervision of her husband and co-defendant David Sobol. In addition, her participation included preparing and submitting false documentation for purchase money loans used to acquire properties in her own name. . .

**DEFENDANT VLADISLAV BAYDOVSKIY'S SENTENCING MEMORANDUM; CR09-084MJP - 33**

RICHARD J. TROBERMAN, P.S.
ATTORNEY AT LAW
1501 FOURTH AVENUE, SUITE 2150
SEATTLE, WASHINGTON 98101-3225
(206) 343-1111

> [Alla] was a director, officer, and managing member of
> Nationwide. [Alla] was also a registered mortgage broker in
> the State of Washington.  Beginning in early 2007, [Alla]
> and her con-conspirators began using the Nationwide entity
> to conduct the mortgage brokerage business operations.

Government's Sentencing Memorandum re Alla Sobol at 2-3.

As noted above, Ms. Sobol's involvement was not just limited to Nationwide.  As the government also observed in its Sentencing Memorandum for Ms. Sobol, Alla recruited her husband to manage the day to day operations of Emerald City Escrow:

> As an experienced professional in mortgage lending business,
> Ms. Sobol was well aware of the benefit of having a captive
> escrow company to facilitate the scheme.  She participated
> in discussions with Vladislav Baydovskiy that led to the
> decision to have her husband and co-defendant, David Sobol,
> assume the managerial duties for Emerald City Escrow.  It
> is very unlikely that he would have undertaken those duties
> without her direction.

Government's Sentencing Memorandum re Alla Sobol at p. 14.

Although the government ultimately tempered its sentencing recommendation for Ms. Sobol by noting that her participation was distinguishable from Mr. Baydovskiy and Mr. Kobzar, it nevertheless described her participation in the fraud scheme as:

> Ms. Sobol was one of the three principals of Nationwide;
> she and her fellow principals, co-defendants Baydovskiy and
> Kobzar, were the experienced leaders of the scheme.

Id, at 19.  Significantly, Ms. Sobol received a four level upward adjustment under the sentencing guidelines for her leadership role in the conspiracy.

One of the principal arguments made by Ms. Sobol's counsel at sentencing was that her involvement in the fraud scheme was limited to her participation at Nationwide.  The government also cited this as one of its reasons to distinguish her involvement from that of Mr. Baydovskiy, because Mr. Baydovskiy was allegedly also involved in fraud at

**DEFENDANT VLADISLAV BAYDOVSKIY'S**
**SENTENCING MEMORANDUM; CR09-084MJP - 34**

Kobay Financial.  What this argument completely overlooked was that prior to joining Nationwide, Alla Sobol was an account representative committing mortgage fraud at Central Bank (where Mr. Baydovskiy first met her), and then at Countrywide.  During that time she was involved in "fixing" credit reports by cutting and pasting, preparing fraudulent W-2s, and even paying off underwriters to overlook problems.  She would tell Mr. Baydovskiy and other loan originators to submit loan packages to her even if they didn't meet her company's guidelines, and she would find a way to fund them by manipulating the documents.

Indeed, Alla Sobol brought fraud techniques to Nationwide that Mr. Baydovskiy had never heard of, including the use of double and triple HUD forms, and also the "virtual downpayment."   These were techniques that she learned and used before she joined Nationwide, which she then shared with her co-defendants.

Ms. Sobol also sought leniency on the basis that she had "seen the light" and voluntarily closed Nationwide, over Vlad's objections, before she became aware of the pending investigation.  This is significant for two reasons.  First, it shows that she controlled Nationwide.  How else could she close it over Vlad's objection?  Second, the reasons she gave for closing Nationwide are not true.  Alla Sobol closed Nationwide because there was no more profit to be made from Nationwide because the lenders had all stopped doing business with them, and all of the loan officers had left.  At the time she closed Nationwide, Alla had already obtained a job with Key Bank.  Alla was also aware that William Anderson and others had recently been indicted in this district (CR08-212RAJ) for similar conduct, and she was concerned that she, too, might be in the government's radar.

RICHARD J. TROBERMAN, P.S.
ATTORNEY AT LAW
1501 FOURTH AVENUE, SUITE 2150
SEATTLE, WASHINGTON 98101-3225
(206) 343-1111

When viewed through the prism of the true facts, the basis for suggesting that Alla Sobol was less involved in the fraud scheme than Mr. Baydovskiy evaporates into thin air.

**VII. RESPONSE TO PROBATION RECOMMENDATION.**

The Probation Office has submitted a sentencing recommendation of 48 months on Count 1, and 22 months on Count 2, <u>to be served consecutively</u>.  This recommendation is insupportable under the Sentencing Guidelines (see U.S.S.G. §5G1.2); under 18 U.S.C. §3553(a); under the facts and circumstances of the case; and as a matter of basic fairness.

    1.  <u>Count One</u>.

We submit that while the recommendation of 48 months is higher than necessary in order to achieve the goals of sentencing (for all of the reasons hereinabove set forth), it at least appears to take into account the sentences imposed on Alla Sobol, David Sobol, and Camie Byron on the same count, and the need to avoid unwarranted sentencing disparity among defendants "with similar records who have been found guilty of similar conduct."  Indeed, recognizing the need to avoid unwarranted disparity, the recommended sentence of 48 months is less than the statutory maximum on that count (60 months).[5]

---

[5]  U.S.S.G. §5G1.2, Application Note 1, provides, in relevant part, as follows:

> Usually, at least one of the counts will have a statutory maximum adequate to permit imposition of the total punishment as the sentence on that count.  The sentence of each of the other counts will then be set at the lesser of the total punishment and the applicable statutory maximum, and be made to run <u>concurrently</u> with all or part of the longest sentence. If no count carries an adequate statutory maximum, consecutive sentences are to be imposed to the extent necessary to achieve the total punishment.

Here, because Probation recognizes that the appropriate punishment for the fraud is less than the statutory maximum penalty, whatever sentence the Court imposes on Count 2 should run concurrently, not consecutively.

DEFENDANT VLADISLAV BAYDOVSKIY'S
SENTENCING MEMORANDUM; CR09-084MJP - 36

RICHARD J. TROBERMAN, P.S.
ATTORNEY AT LAW
1501 FOURTH AVENUE, SUITE 2150
SEATTLE, WASHINGTON 98101-3225
(206) 343-1111

2. <u>Count Two</u>.

The sentencing guidelines on Count 2 (Willfully Making and Subscribing a False Income Tax Return) include a base offense level of 10 pursuant to U.S.S.G. §2T1.1(a)((1) and §2T4.1, and a two level upward adjustment pursuant to U.S.S.G. §2T1.1(b)(1), resulting in an Adjusted Offense Level of 12. See PSR, ¶¶ 50-55. With a two level decrease for Acceptance of Responsibility pursuant to U.S.S.G. §3E1.1(a), the Total Offense Level on Count 2 (subject to grouping) is 10.[6] The sentencing guideline range, based on a Total Offense Level of 10, is 6-12 months. Most offenders in this district convicted of similar offenses, with similar criminal history, receive sentences of probation, community confinement or home detention, or some combination thereof. There is simply no justification for a sentence recommendation of 22 months imprisonment (nearly twice the high end of the guidelines) for this offense, for this defendant, which would without question be wildly disparate from the sentences imposed on the vast majority of similarly situated offenders in this district. Moreover, such "piling on" for this defendant, in light of the fact that it is undisputed that every defendant in this case was guilty of the same conduct (regardless of whether they were charged), is totally unjustified.

Probation's sentencing recommendation is a transparent attempt to circumvent what would obviously be unwarranted sentencing disparity on the fraud count (based on the sentences of the co-defendants) by recommending an unjustifiably high sentence on the tax count. The Court should not countenance such an obvious contrivance.

---

[6] Pursuant to the guidelines dealing with multiple counts, the guidelines for Count 2 do not increase the applicable offense level on Count 1 at all. See U.S.S.G. §3D1.4(c).

**DEFENDANT VLADISLAV BAYDOVSKIY'S SENTENCING MEMORANDUM; CR09-084MJP - 37**

RICHARD J. TROBERMAN, P.S.
ATTORNEY AT LAW
1501 FOURTH AVENUE, SUITE 2150
SEATTLE, WASHINGTON 98101-3225
(206) 343-1111

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## VIII. CONCLUSION.

Vladislav Baydovskiy is a good person who made some very bad choices.  His decision to become involved in mortgage fraud has been a life changing event, the consequences of which he will continue to suffer for many more years.

Upon arriving in this country, Vlad worked hard to overcome his almost pathological shyness and devised his own rigorous self-improvement regimen.  He threw himself into learning to live and work in his new country and became an American citizen in 1997.  Over the past 17 years, he has been earnest, diligent and enterprising.  His years of hard work resulted in some success as a loan originator.  Unfortunately, he became caught up in the "high-risk" lending practices that swept the loan industry during the past decade.   Had he not stepped over the line into this unlawful activity, he would still be home with his wife and children.  He has otherwise been a good citizen in every sense of the word.

Mr. Baydovskiy fully accepts the fact that his offense conduct was serious and that he must serve a term of imprisonment.  It does appear that based on his incredibly difficult childhood, the courage he showed in building a life for himself and his parents here in America, his sincere remorse at having broken the law, the fact that his criminal conduct did not occur in a "vacuum" but was the result of his taking part in the high-risk and fraudulent loan practices that were invented and popularized by the banks and investment banks, and his great love for his two sons, wife, parents and grandparents, that the sentence should be leavened with a modicum of mercy.

There are now four generations of Baydovskiys living in the greater Seattle area, ranging from Vlad's sons to his grandfathers.  Each of the generations depend on Vlad.

**DEFENDANT VLADISLAV BAYDOVSKIY'S**
**SENTENCING MEMORANDUM; CR09-084MJP - 38**

RICHARD J. TROBERMAN, P.S.
ATTORNEY AT LAW
1501 FOURTH AVENUE, SUITE 2150
SEATTLE, WASHINGTON 98101-3225
(206) 343-1111

His father is aging and is currently out of work.   His mother recently endured a reoccurrence of her breast cancer which required aggressive chemotherapy.   She, too, is out of work and her prognosis is uncertain.   Mr. Baydovskiy's grandfathers are obviously far beyond working age, and his two young boys are totally dependent on their elders. Vladislav and his wife are the only able-bodied adults capable of working, and the family's physical and emotional welfare largely depends on them.   Based on his sincerity, intelligence, and lack of any other prior criminality, Vlad is highly unlikely to disappoint either this Court or the numerous individuals who depend on him for their survival.

For all of these reasons, we respectfully submit that under all of the facts and circumstances of this case, a sentence of thirty-six (36) months on Count 1 and six (6) months on Count 2, to be served <u>concurrent</u> with Count 1, is a sufficient, but not greater than necessary, sentence.

We also ask the Court to recommend placement at FPC Sheridan or FPC Lompoc. These are the camp facilities (for which we believe that he is eligible) that would be the most accessible to his family.

DATED this _7th_ day of December, 2009.

RICHARD J. TROBERMAN, P.S.

By: _____

RICHARD J. TROBERMAN
WSBA #6379
Attorney for Defendant
Vladislav Baydovskiy

DEFENDANT VLADISLAV BAYDOVSKIY'S
SENTENCING MEMORANDUM; CR09-084MJP - 39

1

## CERTIFICATE OF SERVICE

I hereby certify that on December 15th, 2009, I electronically filed the foregoing "Defendant Vladislav Baydovskiy's Sentencing Memorandum" with the Clerk of Court, using the CM/ECF system which will send notification of such filing to the attorneys of record in this case.

RICHARD J. TROBERMAN

DEFENDANT VLADISLAV BAYDOVSKIY'S
SENTENCING MEMORANDUM; CR09-084MJP - 41

RICHARD J. TROBERMAN, P.S.
ATTORNEY AT LAW
1501 FOURTH AVENUE, SUITE 2150
SEATTLE, WASHINGTON 98101-3225
(206) 343-1111