UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES of AMERICA,<br><br>                    Plaintiff,<br><br>     v.<br><br>VLADISLAV BAYDOVSKIY, CAMIE BYRON, VIKTOR KOBZAR, ALLA SOBOL a/k/a ALLA PYATETKSAY, and DAVID SOBOL,<br><br>                    Defendants. | Case No. CR09-0084 MJP<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

This matter comes before the Court on the government's memorandum regarding restitution. (Dkt. No. 259.) At the request of the parties, the Court held an evidentiary hearing on April 9 and 12, 2010 on the issue of restitution. (Dkt. Nos. 297, 298.) In addition to the testimony and argument presented at the hearing, the Court has considered the parties' memoranda submitted in advance of the restitution hearing and declarations submitted in support thereof. (Dkt. Nos. 256, 260, 276, 278, 279, 280, 281, 284, 286, 287, 294.) Before setting forth its findings of fact and conclusions of law, the Court summarizes the procedural history of this matter.

**Procedural History**

On March 25, 2009, the grand jury returned an indictment charging Defendants Vladislav Baydovskiy, Donata Baydovskiy, Camie Byron, Viktor Kobzar, Alla Sobol, David Sobol, and Sandra Thorpe with conspiracy to commit bank, mail and wire fraud and bank, mail, and wire fraud for transactions arising out of a purported mortgage fraud scheme. (Dkt. No. 1.) On July 16, 2009, the grand jury returned a superseding indictment. (Dkt. No. 137.) Over the course of the next months, the government filed superseding informations and all Defendants entered pleas of guilty. (See Dkt. Nos. 113, 122, 131, 146, 174, 181, 182.) Defendant Donata Baydovskiy did not plead guilty to a claim involving conspiracy or a scheme and the Court determined restitution as to her separately. (See Dkt. No. 264.) The Court also issued a separate order of restitution as to Defendant Sandra Thorpe. (See Dkt. No. 215.) The Court granted the government's request to conduct a consolidated restitution hearing. (Dkt. No. 201.)

For the purposes of determining the applicable offense level under the Sentencing Guidelines, Defendants Camie Byron, David Sobol, Alla Sobol, Vladimir Baydovskiy, and Viktor Kobzar stipulated the loss amount was between $2.5 million and $7.0 million. In its sentencing memoranda regarding these Defendants, the government used identical language to describe the loss amount stipulation:

> The stipulation specifically provides that it shall not apply to the judicial determination of restitution in this case. The parties are free to advocate for any amount of restitution, wholly independent of the stipulated loss range. In addition, evidentiary submittals offered to substantiate the agreed loss estimate for guidelines purposes are not to be cited to the court for purposes of challenging any proffered claim for restitution.

(See, e.g., Dkt. No. 249 at 9 n.2.) The parties requested an evidentiary hearing to determine the amount of restitution. On January 26, 2010, just a few days before the originally scheduled date for the restitution hearing, the Court and Defendants received the Declaration of James Vach, which attached voluminous documentation of the purported loss amounts organized by lender. (Dkt. No. 255.) Because Defendants did not have the time to analyze the government's

submission in advance of the February 1, 2010 hearing, the Court continued the hearing and set a briefing schedule for the parties. (Dkt. No. 265.) At the rescheduled evidentiary hearing, the Court heard testimony from James Vach, a consumer fraud analyst with the U.S. Postal Inspection Service, and argument from counsel.

**Findings of Fact**

1. Defendants Vladislav Baydovskiy, Viktor Kobzar, Alla Sobol, Camie Byron and David Sobol entered into plea agreements with the United States in which they agreed to "make restitution in an amount to be determined at the time of sentencing or in a separate restitution hearing to be conducted consistent with Title 18, United States Code, Sections 3663A and 3664." (Dkt. Nos. 119 (A. Sobol), 126 (D. Sobol), 150 (Byron), 186 (V. Baydovskiy), 192 (Kobzar).)

2. Defendants Vladislav Baydovskiy, Viktor Kobzar, Alla Sobol, Camie Byron and David Sobol entered into plea agreements with the United States in which each agreed to plead guilty to a Superseding Information charging each defendant with conspiracy to commit bank fraud, mail fraud, and wire fraud, in violation of 18 U.S.C. § 371. (Dkt. Nos. 119 (A. Sobol), 126 (D. Sobol), 150 (Byron), 186 (V. Baydovskiy), 192 (Kobzar).)

3. The language in each Superseding Information alleges a conspiracy to defraud financial institutions by among other things: (a) locating residential real properties that were available for purchase and recruiting straw buyers or otherwise unqualified buyers to participate in purchasing the properties; (b) falsely inflating the value of the properties, (c) submitting false and fraudulent mortgage loan applications, title documentation, and related documents to financial institutions, thereby causing lenders to make loans; (d) creating false and fraudulent documents intended to conceal the diversion of loan proceeds to the Defendant and her co-conspirators; and (e) diverting fraud proceeds for their personal use and benefit, and to further the fraud scheme. The term of the agreement to defraud was alleged to begin no later than September 15, 2005 and continue until on or about December 31, 2008. (Dkt. Nos. 113 (A. Sobol), 122 (D. Sobol), 146 (Byron),181 (V. Baydovskiy), 182 (Kobzar).)

4. Defendants Vladislav Baydovskiy, Viktor Kobzar, Alla Sobol, Camie Byron and David Sobol all agreed in the factual statement of their respective plea agreements that they were "guilty of the charged offense." (Dkt. Nos. 119 (A. Sobol), 126 (D. Sobol), 150 (Byron), 186 (V. Baydovskiy), 192 (Kobzar).) The language of the charged offense, to which the defendants agreed, states that "[d]uring the period of the conspiracy, the Defendant and her co-conspirators secured through straw buyers real estate purchase and re-finance loans, representing millions in loan proceeds, based on false and fraudulent representations. (Dkt. Nos. 113 (A. Sobol), 122 (D. Sobol), 146 (Byron), 181 (V. Baydovskiy), 182 (Kobzar).)

5. The plea agreements identify the following properties and transactions as "representative examples of overt acts" committed by the co-conspirators:

    A.    2632 78th Avenue NE, Medina, WA (Dkt. No. 186-2 at 9; Dkt. No. 192 at 9.)

    B.    5571 Lakemont Blvd. SE Apt 1404, Bellevue, WA (Dkt. No. 150 at 9)

    C.    5579 152nd Place SE, Bellevue, WA (Dkt. No. 126 at 9; Dkt .No. 119 at 9.)

6. For the three properties listed in the plea agreements, Defendants fraudulent conduct caused losses as follows:

**LOSS TABLE**

| **Property** | **Victim** | **Description of Loss** | **Documentation** | **Amount** |
|---|---|---|---|---|
| 5579 152nd Place SE, Bellevue, WA | Aurora Loan Services (Homecomings Financial) | REO Sale | Elliot Decl. ¶ 5 (Attached to Vach Decl.) | $468,946.11 |
| 5571 Lakemont Blvd. SE Apt 1404, Bellevue, WA | J.P. Morgan Chase (Bear Sterns Residential Mortgage Corp.) | Short Sale of 2 Loans | Simmons Decl. ¶ 4 (Attached to Vach Decl.) | $180,049.59 |
| 2632 78th Avenue NE, | FDIC (Taylor Bean & | Pending Foreclosure | Flynne Decl. ¶ 4 (Vach Decl.) | $1,487,424.36. |

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 4             CASE NO. CR09-0084 MJP

| Medina, WA | Whitaker) | | | |
|---|---|---|---|---|

7.  For the remaining victims listed in Exhibit C to the Vach Declaration, the government has failed to demonstrate, by a preponderance of the evidence, that the alleged victims suffered loss caused by Defendants' conduct.

## Analysis

Under the Mandatory Victims Restitution Act, defendants who commit crimes of "fraud or deceit" are required to pay restitution.  18 U.S.C. § 3663A(c)(1)(A)(ii).  The statute defines "victim" as "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered …."  18 U.S.C. § 3663A(a)(2).  The government bears the burden "of establishing by a preponderance of the evidence that the victim's damages were caused by the conduct of which the defendant was convicted."  United States v. Peterson, 538 F.3d 1064, 1074-75 (9th Cir. 2008) (quoting United States v. Rice, 38 F.2d 1536, 1540 (9th Cir. 1994)); see also United States v. Andrews,  600 F.3d 1167, 1171 (9th Cir. 2010) (government bears the burden of proving both (1) person is a victim for the purposes of restitution and (2) the amount of the loss).

When analyzing restitution in the context of a conspiracy, "the restitution order may include acts of related conduct for which the defendant was not convicted."  United States v. Brock-Davis, 504 F.3d 991, 999 (9th Cir. 2007) (quotations and citations omitted); see also United States v. Bright, 353 F.3d 1114, 1120 (9th Cir. 2004) (affirming restitution order based on conduct for dismissed counts).  The inclusion of related conduct in the Court's analysis does not, however, alleviate the government of its burden.  As the Ninth Circuit recently reiterated in Peterson, "[r]estitution may compensate victims only for actual losses caused by the defendant's criminal conduct."  538 F.3d at 1075 (quotation omitted) (emphasis added).  The Peterson court quoted an earlier opinion in United States v. Gamma Tech Indus., Inc., 265 F.3 917 (9th Cir. 2001):

> Defendant's conduct need not be the sole cause of the loss, but any subsequent actions that contribute to the loss, such as an intervening cause, must be directed related to the defendant's conduct. The causal chain may not extend so far, in terms of the facts or time span, as to become unreasonable.

265 F.3d at 928. The Peterson court relied on testimony at trial demonstrating defendants sold 43 properties using false gift letters to HUD. Id. The Peterson court cited favorably United States v. Spicer, 57 F.3d 1152, 1154 (D.C. Cir. 1995), where the D.C. Circuit affirmed a restitution order based on a defendant's factual stipulation that he made misrepresentations on a total of 81 mortgage applications. See Peterson, 538 F.3d at 1076.

Unlike the scenarios in Peterson or Spicer, the Court here does not have a trial record or factual stipulations from which it can make findings as to restitution. At the evidentiary hearing, the government did not admit the "fraud book" that formed the basis of its Indictment. Indeed, the government agreed to proceed without the fraud book before the Court could rule on Defendants' objection to the presentation of the fraud book:

> Government (Mr. Oesterle): Focusing on the loans that are the subject – one subject of today's proceeding, how was it that the government identified the initial set of loans what were categorized as being potentially fraudulent?
> Mr. Vach: Well, I know that the FBI had begun the investigation. Our agency became involved somewhat after that. We were told that they believed that there was several entities involved in the fraud, in a mortgage fraud. We began to – we took the names of those people that we had, ran them through data bases, looked for properties in their names, and then also looked for names of people that they sold those properties to, and then we ran those names through data bases to see what properties they had, and then began to subpoena bank records and mortgage file records.
> Government: And what was the result of the efforts? Was there a document prepared by yourself or the others?
> Mr. Vach: Yes, we produced a document that we call the fraud book.
> Government: And what information is included in the fraud book?
> Mr. Vach: It usually gives an address, a sale date, the seller and the buyer, what the status – we have a column as far as whether the investigation was still pending … the mortgage file, the amount of the mortgage, the mortgage lender, the loan number, the escrow agent, the escrow company, which was Emerald City. That's what we were focused on. The loan broker, the loan application date, the name of the employer, the monthly salary. If there was a 1040 or W-2 included, information regarding verification of deposit and employment, and then a notes column for clarification of some of those other items.

> Government: Were the loans – were all of the loans listed on the fraud book determined to include fraud of one sort or another in their preparation or submittal?
> Mr. Grant: Object to the question.
> Mr. Offenbecher: I am going to object to the item to the extent that the witness is going to testify about a document that has not been provided to the court. Can I voir dire the witness on that?
> …
> Mr. Offenbecher: I object to him testifying about a document that at this point on the day of the hearing has not been provided to the court and the defense counsel had no notice that a fraud document was going to be a subject of his testimony here …
> The Court: Mr. Oesterle, any response?
> Government: I can proceed without referencing the fraud book. It was a background document that actually was the source of a document that has been produced to the parties and the court. I can move on from here.
> The Court: All right. Go ahead.

The government's next question relates the identification of loan losses, not the identification of fraud in the loan application materials. The importance of the fraud book became apparent in later questioning:

> Government: And did you -- have you determined whether the application was accurate?
> Mr. Vach: We determined that it was a fraudulent application.
> Government: Based on what?
> Mr. Vach: As I recall – well, let me – if I may – may I reference the fraud book?
> Government: I believe there is an understanding that we're not to be referencing that. It has not been submitted to the Court.
> Mr. Vach: I am trying to recall in that instance what the fraud was involving that particular loan. I believe it was income and employer.

Instead of the fraud book, the government submitted two summary exhibits which described various loss calculations for certain loans without an explanation of the fraud at issue in each loan. The first document, Exhibit A to the Vach Declaration, was created simply to identify the holder of the loans that originated from Defendants' companies.[1] (Vach Decl. ¶ 5, Ex. A

---

[1] As indicated in the exhibit, a number of loans are now owned by different banks other than the original issuing entity.

(entitled "Losses from Lenders").) Mr. Vach created the second summary document, Exhibit C, upon receipt of loss documentation from the lenders. (Vach Decl. ¶ 10, Ex. C.) Neither document correlates the properties to any fraudulent loan documents. Instead, the exhibits to the Vach Declaration provide documentation of the loss amounts on the assumption that the losses were caused by Defendants' conduct. At an evidentiary hearing, the Court cannot make this assumption. Mr. Vach's testimony did not explain how Defendants' fraud caused the losses presented:

> Q: … Was there a determination made as to whether the loan that was secured to purchase this property was secured using fraudulent means?
> A: Yes. All of the properties on this Exhibit C were deemed to be fraudulent loans.
> Q: And who made that determination?
> A: The investigative prosecution team.
> Q: What is that determination based on?
> A: Based on a review of the files and witness testimony, a review of seized materials, and on admissions by the defendants and proffers.

The government's description of its own review of the record, of course, does not create a record before this Court. The need to explain the nature of the fraud is particularly important in cases such as this one where Defendants processed loans that did not include fraudulent means alongside loans that did include fraud.

The government's closing argument also appeared to assume the Court had heard testimony regarding Defendants' use of fraudulent loan documents:

> Mr. Oesterle: The defendants here created the false documentation. They obtained the loans using that documentation. They then closed on those loans using further false documentation. . . . So, really, it's fine to talk about all those other things, but they don't change the most important fact, which is those loans were obtained by fraudulent means.

The Court did not hear testimony or receive documents demonstrating that, with respect to all the loans identified in the Vach Declaration, Defendants created the false documentation, that they obtained the loans using that documentation, or that they closed the loans using false documentation. The government failed to meet its burden of demonstrating, by a preponderance of the evidence, Defendants' criminal conduct caused the loss amounts set forth in Exhibit C to the Vach Declaration. In the absence of such a showing, the Court may only impose restitution for restitution for losses related to properties for which the Defendants admitted preparing fraudulent documents.

The Court summarizes its calculation for each of those properties as follows:

2632 78th Avenue NE, Medina, WA

Though the loan (#1694519) was originally issued by Taylor Bean & Whitaker, the loan is now being held by the Federal Deposit Insurance Corporation ("FDIC") and the FDIC is thus the victim. The unpaid balance on the original $2.4 million loan is $1,721,378.33 and a tax assessment obtained by the FDIC values the property at $471,000.00. (Vach Decl. at "FDIC" tab, Flynne Decl. ¶ 4.) The FDIC's estimated loss, based on the FDIC-R formula related to foreclosures is $1,487,424.36. The FDIC is entitled to restitution in the amount of $1,487,424.36.

The government also submitted a request from Marina Bakhmet that sought attorneys' fees. (Vach Decl. at "Bakhmet, Marina" tab.) While attorneys' fees arising as a direct and foreseeable result of the Defendants' conduct are compensable, the documentation submitted must allow the court to show they were "necessarily incurred." United States v. Waknine, 543 F.3d 546, 558-59 (9th Cir. 2008) (citations omitted). Here, Ms. Bakhmet's counsel's submission

does not describe in sufficient detail the work completed or why it was necessary to protect Ms. Bakhmet's interests. The Court declines to award Ms. Bakhmet these fees.

<u>5571 Lakemont Blvd. SE Apt 1404, Bellevue, WA</u>

Though the loans (# 16528747 and #16528598) were originally issued by Bear Sterns Residential Mortgage Corp., they are now being held by the J.P. Morgan Chase, which is the victim. The unpaid balance on loan #16528747 is $106,000 and the unpaid balance on loan #16528598 is $424,000. (Vach Decl. at "Chase" tab, Simmons Decl. ¶ 4.) The property was sold through a short-sale for $430,000. The documents established Chase suffered $180,049.59 in loss as a result of Defendants' conduct. Chase is entitled to restitution for that amount.

<u>5579 152nd Place SE, Bellevue, WA</u>

Though the loan (#21941935) was originally issued by Homecomings Financial, the loan is now being held by Aurora Home Loan Services, which is now the victim. The total debt on the loan is $1,173.922.04, including the unpaid balance, accrued interest, and advance balances. (Vach Decl. at "Aurora" tab, Elliott Decl. ¶ 5.) The property sold through an REO sale for $704,975.93. Aurora is entitled to $468,946.11 in restitution from Defendants.

**Conclusions of Law**

1. The Mandatory Victim Restitution Act applies in this case because defendants Vladislav Baydovskiy, Viktor Kobzar, Alla Sobol, Camie Byron and David Sobol entered guilty pleas to engaging in a conspiracy to commit bank fraud, mail fraud, and wire fraud.

2. The number of victims in this case is not so large as to make restitution impracticable and determining issues of fact related to the cause or amount of the victim's losses will not complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by any burden on the sentencing process.

3. Defendants Vladislav Baydovskiy, Viktor Kobzar, Alla Sobol, Camie Byron and David Sobol shall make restitution to the victims identified in the Loss Table in the amounts entered in the Table.

4. While the Court finds that more than one defendant contributed to the losses incurred by the victims, defendants Vladislav Baydovskiy, Viktor Kobzar, Alla Sobol, Camie Byron and David Sobol shall each be jointly and severally liable for payment of the full amount of the restitution.

5. Defendants shall make monthly payments of no less than 10% of their household income as determined by the probation department.

**Further Proceedings**

The Court directs the parties to meet and confer to draft a proposed restitution order in accordance with the findings of fact and conclusions of law set forth above within 10 days of this Order.

Dated this 18th day of June, 2010.

Marsha J. Pechman
United States District Judge